Harold A. Stevens, J.
Plaintiff seeks a permanent injunction enjoining the defendants from engaging in the securities business within and from the State of New York on the ground that the defendants had participated in fraudulent practices as defined in article 23-A of the General Business Law, section «352 et seep, commonly known as the Martin Act.
*45 The plaintiff alleges, in brief, that the defendants, doing business as Tellier & Co., herein called Tellier, offered and sold to complainants and to the public generally within the State of New York, thousands of shares of common stock of Consolidated Uranium Mines, Inc., hereinafter called Consolidated, from in or about April, 1954, to in and about December, 1954. That in connection therewith and as a means of accomplishing that result defendants made certain promises, statements and representations which were false, misleading, untrue and unwarranted by conditions then existing. That the defendants knew or should have known that to be so, and that such representations were made for the purpose of fraudulently inducing the public to purchase such stock. That the mediums used were pamphlets, various forms of printed matter, salesmen, advertising, the mails and telephone calls. That certain material facts were not disclosed, as they should have been, to buyers, prospective buyers and to the public generally.
The plaintiff alleges further that from on or about August 15, 1951, to in or about June, 1955, the defendants offered for sale and sold to complainants and to the public generally within the State of New York four series of debentures of Alaska Telephone Company, herein called Alaska, in certain stated denominations, from which defendants received total commissions and expenses of approximately $150,000.
That for the purpose of inducing complainants and the public generally to buy, and in connection with the offerings and sales defendants published and distributed certain printed matter containing promises and representations concerning Alaska which were false, fraudulent, misleading and untrue, and known, or should have been known, to defendants to be so. That defendants used also, the mails, telephones and advertising, for that purpose, and the defendants failed to disclose and fraudulently concealed certain material facts.
The defendants by their answer admit the making of certain statements or representations, deny the falsity of such statements or representations, or knowledge thereof, and, in essence, deny any wrongdoing. The defendants were underwriters for Consolidated and Alaska and also sold the stock.
Directing our attention first to Consolidated, it appeared at a trial on the issues, that this was a Nevada corporation organized in 1950, devoted primarily, in the beginning, to the search for and development of uranium mines. There was some testimony that at a later period, in 1954 and early 1955, it considered, and did branch out in a small way into tungsten mining.
*46 The stock was offered originally for about 15 cents per share, the first public offering being one million shares in March, 1951, the issue being underwritten by Tellier. Later, in 1952, Consolidated made another offering of 357,000 shares at 42 cents per share, also underwritten by Tellier. Only about one third of this issue was sold. The net received by Consolidated from this financing was approximately $132,500.
A brief review of the financial condition of Consolidated might prove of interest. From its organization in 1950, through the fiscal year of 1955, such year ending July 31, 1955, it had a gross income of approximately $5,697,732, of which all except about $650,000 was derived from one area, the Temple Mountain area.
Consolidated began with a capital of approximately $100,000, and in its early operations incurred deficits. In 1953, however, it had a net income of $21,385.30, which, applied to previous deficits, left a net deficit of $94,621.50 with 7,833,843 shares outstanding. In the fiscal year 1954, it had a net income of $115,490.94, and retained net earnings of $20,869.44, after picking up the deficit of 1953, with 8,370,091 shares outstanding.
In the fiscal year 1955, it had a net income of $194,897, which, added to the retained net earnings of 1954, equalled $215,767.21 with 14,836,869 shares outstanding. As of December 31, 1954, there were 13,820,591 shares outstanding.
Examining the property and its potentialities we might arrive at a clearer picture.
The Temple Mountain area from which the major source of income was derived was under a 10-year lease from May 16, 1950, with no automatic right of renewal but only a first refusal option. It had a possible and probable tonnage of 342,000 tons of shipping ore of a potential value of $9,800,000 of which 10% would represent a profit before taxes.
In fact, on all of the acreage there was a more or less constant shifting and turnover, with little permanent holdings, since the acreage was used largely for exploratory purposes, with the total acreage varying as dictated by circumstances.
The president of Consolidated, Edward Frawley, estimated the ore reserves, measured, probable and potential, on property owned, optioned, or with a right of examination by Consolidated at the end of 1954, to have a gross value of between 14 and 16 million dollars, including moneys received from property sales, with a net operating profit to Consolidated to be derived therefrom of approximately $2,405,000. He estimated this would require three years to extract the ore at a given rate of progress, though of course in that period other property might be *47 acquired and relinquished. On the number of shares outstanding as of December 31, 1954, this would mean approximately 17 cents per share before taxes.
Considering the earnings of Consolidated as of the end of the fiscal year 1954, and the shares outstanding, there would be a division of about 1% cents per share, and on the same basis at the end of the fiscal year 1955, about 2 cents.
The question arises whether in light of these facts, and we so determine them to be, statements in circulars, pamphlets, letters or other printed matter sent out to dealers and/or customers and the public generally, of the following nature are warranted (and we quote a few).
‘ ‘ If you have a friend or relative that you wish to give an everlasting Xmas gift to — give Consolidated, because in a few years we still believe Consolidated will sell at $10-$20 per share ”, this while the stock was offered at $1 per share. “ After you receive your Consolidated — put it away for 5 or 10 years, wait for the dividends, the returns could be big on the amount of money you have invested.” “ Your children may enjoy it most, so put 1 or 2 thousand shares of Consolidated away for them.”
There was other language which might reasonably be construed to indicate that about 1957, Consolidated would think about paying dividends, though the reports to stockholders stated it to be company policy to “plow back” the returns into company development. The defendant Tellier, individually, testified that Frawley told him in July, 1954, about the prospect of dividends in 1957, but Consolidated’s literature does not support it, and although Tellier sent out several pieces of literature subsequent to the alleged conversation, the statements re dividends does not appear until about December, 1954.
The literature set forth also that Consolidated had about 80,000 acres (which in fact it did from about Sept, to Dec., 1954) on three acres of which it had already discovered what looked like one million dollars’ worth of ore. In fact, Consolidated never accepted the three acres, and its engineer after a map analysis estimated its gross value at approximately $145,000, with a direct cost of production of the same slightly in excess of that amount.
In this connection the defendants offered the testimony of the expert who drew the map, after supervised drilling, that in his opinion there was a solid body of ore worth one million dollars, at that location. While the drilling, upon which this estimate was made, was done largely in November and some in *48 December, 1954, the circular containing the reference to three acres was issued in December, 1954, apparently on information obtained from someone outside of Consolidated and in contradiction of views held by the officials of Consolidated. The defendants were not warranted in relying on the opinion of a stranger to the corporation, nor to use such opinion to bolster acts done contrary to the reasoned conclusions of corporate officials.
Much of the printed matter of Tellier did not contain any reference to the stock as a speculation, which we find it was in fact, nor identify it in that manner. Even where such identification appeared we are of the opinion that the general content conveyed the idea of a sound investment with long-term possibilities.
True, in a number of instances the individual Tellier claimed that he obtained certain information or approval from conversations with Frawley, which Frawley denied.
It appears also that from January through August, 1954, Tellier purchased and sold the stock of certain directors or former directors of Consolidated, and that he went short on his own individually owned stock about this time. From July through. September, 1954, the stock took an unwarranted rise, going as high as $2 per share for a brief period.
In 1954, Consolidated had an “ acquisition of assets ” deal from which it received approximately $600,000 and certain assets of other companies, much of the cash going into a development of tungsten though up to the end of 1954 tungsten mining did not show a profit.
Some testimony by certain purchasers of Consolidated through Tellier was to the effect that they read and relied on the contents of the literature sent out by Tellier, that they were induced to buy as a result, and believed the stock to be a good investment.
Consolidated had to borrow money on several occasions, some of which were interim borrowings against shipments, but not all. And while Tellier had no obligation to lend, the record discloses his refusal to do so, and may be indicative- of his belief in future possibilities.
We find that certain representations and statements were in fact made by Tellier which were misleading and, in some instances, false, and unwarranted by conditions then existing of which Tellier was or reasonably should have been aware. Nor do we conclude that the reports of Consolidated to its stockholders, some of which were couched in decidedly optimistic language, constituted a justification. One who stands *49 in loco parentis to an infant may be expected to view its future with fond hopes, but the stranger cannot be lost in the rosy haze. So is it here.
Responsibility, or freedom from responsibility, may not be predicated alone upon the presence or absence of a single term. There is no magic in the use of the word ‘‘ speculation ’ ’ though its presence may serve to caution the unwary. Rather are we to view the picture or article in its entirety. So doing, we conclude the fair import of the language used, reasonably construed, was more than suggestive of sound investment. From exhibits in evidence we entertain no doubt of defendants’ awareness of the situation.
The position of defendants with respect to Alaska presents a different factual picture.
There were four series of debentures offered to the public by Alaska for which Tellier was the underwriter.
Series A, dated August 1, 1951, face amount $299,500, 6%, 20-year convertible debentures; Series B, face amount $150,000, issued April 1, 1953, 6%, 10-year convertible debentures, plus an offering of 40,000 shares of common stock of which only 1,496 shares were sold; Series 0, face amount $270,000, 6%, 10-year convertible debentures issued April 1, 1954; and Series D, face amount $158,000 (of which only $153,000 were sold), 6% 10-year convertible debentures issued December 1, 1954. The debentures were issued in principal denominations of $100, $500 and $1,000, and issued under indentures executed between Alaska and Colonial Trust Co., as trustee.
The underwriting agreement gave the underwriter, Tellier, the exclusive agency in connection with the distribution. It was provided that he should receive a selling commission of 20% plus costs and expenses up to $20,000 on Series A, and a commission 10% plus costs and expenses up to $10,000 on all other series. Tellier received 25 cents per share for the 1,496 share of common stock actually sold under the Series B offering.
Series A was offered at 100% of the principal amount, while B, C, and D were offered at $70 for each $100 face amount. All bore interest at 6% payable monthly.
Under the various trust indentures it was provided that Alaska should maintain on deposit with the trustee, at all times an amount equal to the current monthly interest plus five months’ additional interest. It was provided further if Alaska committed a default by failure to pay interest when due or within 60 days thereafter, or failed to perform any condition or covenant of the indenture, such default continuing for 60 days after notice to Alaska by the trustee, the trustee *50 on. behalf of all debenture holders “ may ” declare the principal on all debentures then outstanding to be immediately due and payable.
There was a difference in the testimony as to whether Alaska operated at a small profit for the years 1948-1951, or at a loss. One firm of accountants showed a loss, another firm a small profit. Be that as it may, there is no doubt that in 1951, 1952 and thereafter Alaska suffered substantial losses.
Primarily, Alaska operated telephone systems at and in certain towns or cities of Alaska together with power plants ■ at Skagway and Nenana. Because of the nature of its business it had to operate pursuant to local franchises.
. , There were disputes from time to time over the rates fixed by franchise and the inadequate return to Alaska as a result.
Each offering circular for the respective series of debentures provided that a designated amount of the proceeds would be used for payment of “ current obligations ”, that commissions and expenses of the offering would be paid, certain portions used for expansion and the balance for working capital.
An analysis of the use of the proceeds of the sale of the debentures reveals that a substantial portion of each succeeding issue was used to pay the interest on the preceding issue or issues, and to meet the interest obligations on the current series as well. A total of approximately $99,580.47 was so used.
The defendants contend that interest should be chargeable as an expense before arriving at the net return to which Alaska is entitled. If that view be adopted, interest would fall, presumably, in the category of current obligations.
It appears also that about $16,640.63 was used from the proceeds of the debentures to pay trustee’s fees and expenses. After certain failures by Alaska to maintain the agreed interest reserve the trustee, with the knowledge of Tellier, obtained a written authorization from Alaska to transfer funds, when available, from Alaska’s Checking or Proceeds Account on deposit with Colonial, to Alaska’s Interest Account. There was a similar method used, upon occasion, for payment of trustee’s fees.
The defendants contend, as to this, that it was cheaper to use State-side funds than to send the money from Alaska. This is true. There is no showing however that there were in fact sufficient funds available elsewhere to meet such obligations. The contrary is apparent.
Reference might be made also to the difference in treatment and classification of the proceeds of the debentures.
*51 Where there was an obligation in existence at the time a series was issued, whether that obligation be on a mortgage payment due, or a payment due on the plant and equipment, the plaintiff in its analysis treated it as a payment of current obligations. The defendants contend, depending on the nature of the payment, that it should be treated as a capital expenditure for plant expansion and equipment.
The difficulty with this seems to be that when purchases were made, whether of a plant or on chattels, the full amount of the purchase price was set up as an asset at the time even though an unpaid balance remained. The balance due was set up as a liability, but when such balance was reduced or paid there was not a corresponding increase in assets. Actually, as a result, the cash assets were reduced.
Alaska had a net operating loss which reached a high in 1952 and decreased gradually thereafter up to the first six months of 1955, the time embraced within the complaint. Its net loss however was apparently increasing during the entire period from 1951.
The plaintiff’s witness testified on cross-examination that in his opinion, based on a given formula, in about three years beyond 1955, Alaska might reach a point of operating profit. That is, the operating loss would exist no longer.
On redirect, using the same formula, the witness testified that in his opinion it would require about 17 years to reach a point where Alaska could earn sufficient operating profit to make up the “ debenture expenses, the interest, the amortization and Trustee’s fees”. He pointed out that the net losses were increasing because of the fixed charges on the “ outstanding debentures, the amortization of the debenture discount and expenses and the Trustee’s fees ”.
There were a number of arrears in interest payments of less than 60 days beginning as early as May or June, 1952, that is prior to the issuance of Series B, and a default of more than 60 days had occurred before the issuance of Series B.
There were defaults of 60 days or more in the interest payments on A and B Series, prior to the issuance of Series 0. In fact, on February 17, 1954 Tellier advanced $4,500 in two payments of $2,250 each, to wipe out a default, with an agreement that he would be reimbursed out of the proceeds of Series C, which was done on May 7, 1954.
There were also defaults of 60 days or more in interest payments on A, B and C Series prior to the issuance of Series D, and in or about August, 1955, Tellier advanced money to pay interest due June 10, 1955.
*52 In January, 1954, if not before, the trustee learned of the existence of tax liens against Alaska which, under the terms of the trust indenture, could have been grounds for default. Checks were drawn also on the account with trustee to pay taxes.
While the trustee apparently was aware of the financial condition of Alaska, it chose not to treat failure to make interest payments promptly, or defaults, or the existence of tax liens as a default warranting a declaration that the principal on debentures outstanding was immediately due and payable. It obviously preferred to rest upon the existence of the permissive “ may ” in the indenture. Certainly it,was more profitable to do so for it acted as trustee for later series.
It should be mentioned that there were letters of opinion from trustee’s counsel to the trustee advising there was no objection to its acting as trustee and that the necessary documents for the various series were in proper form.
If Colonial was not aware of the disposition of the proceeds of “ A ” and “ B ” series, it learned of the disposition of the proceeds of the “ C ” series by letter dated October 13, 1954, sometime prior to the issuance of Series “ D ”,
Obviously Alaska was not in a good position financially. At times its cash position in 1953 and 1954 reflected less on hand than the amount collected from subscribers for deposits. But we must ask ourselves if Tellier was aware of the precarious financial condition.
On February 3, 1952, Cahn, Tellier’s attorney, was elected a member of the board of directors of Alaska. It appears from the evidence in the case that Cahn prepared the offering circulars for Series A and B, and Jones, then president of Alaska, testified that in preparation for doing so, Cahn examined the books and records of Alaska. This was not denied.
Subsequently, on or about April, 1953, Tellier loaned $6,000 to Alaska, but deducted $500 for Cahn’s expense in making the trip to Seattle to prepare the letter of notification and offering circular, and actually sent a check for $5,500. By letter dated March 27, 1953, Jones, president of Alaska, had informed Cahn that the proceeds of the loan would be used to pay property taxes, unemployment compensation tax, etc. The money to be repaid from the proceeds of the sale of debentures, to be evidenced by a demand note.
In a letter dated December 30, 1952, from Jones to Tellier, reference was made to the necessity for drastic action if Alaska was to remain in business, and to Alaska’s then serious situation. Also a telegram from Cahn to Jones, dated March 11, 1953, pointing out that the' January interest payment was in *53 default (more than 60 days overdue) and the February and March payments were past due. All of this was before the “ B ” series, issued April 1,1953.
If we were inclined to view the actions of Tellier as an effort to aid Alaska because of a sincere belief in its future, and this might be true of the “ A ” and “ B ” series, we look at a memo of June, 1954, from Tellier, personally, to Proctor, containing, in part, this language, “ Better start building those Bondholders now and every month from now on for the next issue ’ ’ —-“watch your cash and expenses and for God’s sake don’t go broke because you cannot get a new issue out until next year ”, etc. We look also at Exhibit 42, a letter and report of how the proceeds of the “ C ” series were used. This was sent by Alaska to Colonial and a copy to Tellier. Jones testified also that in February, 1954, he discussed Alaska’s financial position with Tellier personally.
Again, Tellier advanced $4,500 in February, 1954 to pay interest and avoid a default, for which Tellier was reimbursed out of the proceeds of Series C. There was an earlier letter of Cahn to Alaska, dated April 23, 1953, referring to interest owed on “A” and “B” debentures, and defaults in interest, which pointed out the necessity of pacifying the trustee in order to get the issue on the market.
There is some testimony and evidence here that there were short-form registrations, letters of notification and copies of the offering circulars filed with the SEC.
We are not too much impressed by that because it does not appear that it was disclosed that there were defaults in interest payments and that the proceeds of later series were used in substantial measure to pay interest and other fees on earlier series. Moreover, under section 77w of title 15 of the United States Code (Securities Act of 1933) these apparently being exempt securities since each offering was less than $300,000, the filing of the statements and the fact that the SEC did not prevent issuance of the securities did not mean that SEC approved the merits of the offering or passed upon the accuracy of any representations. Opinions are of value when a full disclosure is made.
Tellier received a substantial sum as total commissions and expenses from the series.
We find from the evidence that Tellier did use advertising, the publication and distribution of circulars and other media of communication within the State of New York, in its offerings to the complainants and to the public generally to induce them to purchase the debentures, even as it did to sell the stock of Con *54 solidated. That it made certain false representations of material facts, including the amounts used and to be used for plant expansion, and withheld information it possessed of the actual use of the proceeds. That these factors operated to induce members of the public to buy, and they did buy, such bonds. Eepresentations as to possible earnings were unreasonable, misleading, and not warranted by circumstances existing, which we are convinced were known to Tellier, or in the exercise of reasonable care should have been known.
Was Tellier justified in relying upon information given by Consolidated and Alaska, without further investigation? And was Tellier warranted in drawing the inferences it apparently did, as indicated by the printed matter issued by it, without further check?
“ Promoters are under a duty to make reasonable investigation before issuing a prospectus and to the extent that they fail in the performance of their duty, lack of scienter will not relieve them from liability in actions brought under the Martin Act ” (People v. Federated Radio Corp., 244 N. Y. 33, 41).
What is “ reasonable ” is of course a fact to be determined from surrounding circumstances and conditions. But it seems to us that a minimum of investigation could not have failed to disclose the real conditions existing here.
Our courts have held that the purpose of this law (the Martin Act) is “to defeat all unsubstantial and visionary schemes in relation thereto whereby the public is fraudulently exploited ’ ’. They give to the terms ‘‘ fraud ’ ’ and ‘ ‘ fraudulent practice ’ ’, “ a wide meaning so as to include all acts, although not originating in any actual evil design or contrivance to perpetrate fraud or injury upon others, which do, by their tendency to deceive or mislead the purchasing public come within the purpose of the law ” (People v. Federated Radio Corp., supra, pp. 38-39).
We have no doubt and so find, that the language and methods used had a tendency to deceive and mislead the purchasing public. The fact that the sales may be concluded will not bar the remedy of injunction (General Business Law, § 353).
We referred earlier to the contention of Tellier that interest payments be included in the term “ current obligations ”. We are of the opinion that such interest payments as revealed here, in the amounts set forth, would not reasonably be so construed by the general public to which the offerings were made. In brief, that there was not that clarity or effective disclosure which would be “ plainly understandable to the ordinary investor ”. Had there been, and had the public been aware of the defaults and the fact that a great pay! of the money realized *55 on the sale of the debentures would be used to pay interest and cure the defaults, we entertain little doubt that they would not have purchased the debentures.
It has been held repeatedly “ that the nature of relief in an action under the Martin Act is essentially equitable in character ” (People v. Abbott, 4 Misc 2d 565, 567; People v. Riley, 188 Misc. 969; General Business Law, §§ 352, 353).
We have here between 25 and 30 years of good business practice on the part of Walter Tellier, the major partner, or at least nothing to the contrary was shown in the trial before us. The activity in these stocks and bonds continued over a period of years, while the corporations apparently strove to produce and develop. In our opinion while the conduct of the defendants warrants restraint we do not feel that it should be of permanent duration from engaging in any manner in the business of securities. Section 353 vests a measure of discretion in the court.
Accordingly, judgment is rendered in favor of the plaintiff enjoining the defendants from engaging in the securities business in and from the State of New York as principal, agent, broker, dealer, salesmen, customers’ men, and in the manner sought by plaintiff for a period of five years from the date of entry of the decree to be submitted herein. While Brosnan and Sandler were possessed of lesser interests, they shared the profits and benefits, and must bear the responsibility also.
No costs are awarded.
Submit decree on notice.
The above is the decision of the court as required by section 440 of the Civil Practice Act, so far as applicable.