INTERCONTINENTAL HOTELS CORPORATION (PUERTO RICO), Respondent, *v.* JACK GOLDEN, Appellant.

First Department, February 26, 1963.

*Stanley L. Gluck* of counsel (*Kaufman & Gluck,* attorneys), for appellant.

*David R. Finkel* of counsel (*Bernard A. Finkel* with him on the brief; *Saul A. Finkel,* attorney), for respondent.

VALENTE, J.   The question in this case is whether the courts of New York will sanction recovery by plaintiff of the amount of credit extended by its gambling casino in the Commonwealth of Puerto Rico to a patron to permit him to continue gambling.

Defendant was a guest at plaintiff's Intercontinental Hotel in Puerto Rico from December 8 through December 14, 1960.  During his stay there, in an attempt to turn chance into fortune, he played — on credit generously furnished by plaintiff — at the dice tables in the casino conducted by the hotel, lost and, when he ascertained the extent of his indebtedness, reneged.  Following the loss of $6,000 in cash which defendant allegedly brought

with him, plaintiff advanced chips to the defendant in the sum of $12,000 which he eventually also lost. On December 14, 1960, he delivered to plaintiff his check for $3,000, dated December 17, 1960, payable at the Manufacturers Trust Co. in New York City, in part payment of his gambling debt. The check was not honored when presented for payment. For the remaining $9,000 defendant had given plaintiff 13 I. O. U.'s. At Trial Term, plaintiff recovered judgment on the check and the I. O. U.'s for the full $12,000 plus interest of $1,102.50.

Strangely enough, no appellate court in this State has ruled on the question of whether there can be recovery in New York on a professional gambling debt incurred in a jurisdiction where gambling is legalized.* It is conceded that in Puerto Rico gambling has been legalized (Laws of Puerto Rico Ann., tit. 15, ch. 5, §§ 71–84) and that plaintiff's casino was duly licensed at the time defendant used its facilities.

Subdivision 1 of section 9 of article I of the New York State Constitution provides that "no lottery or the sale of lottery tickets, pool selling, book-making, or any other kind of gambling, except pari-mutuel betting on horse races * * * shall hereafter be authorized or allowed within this state." The exception as to pari-mutuel betting was incorporated by amendment in 1939; and, by an amendment in 1957, subdivision 2 was added to section 9 to authorize, upon a local option basis, the conduct of games of chance commonly known as bingo and lotto. More particular reference to these amendments will be made hereinafter.

The constitutional prohibition on all kinds of gambling has existed since 1894. Article 88 of the Penal Law contains numerous provisions making different types of gambling criminal offenses. In *People* v. *Lambrix* (204 N. Y. 261, 264–265) CULLEN, C. J., in referring to the Penal Law provisions on gambling said: " while all gambling has for a long time been illegal in this state, professional gambling and the maintenance of gambling resorts alone have been subjected to the penalties of the criminal law."

So, too, in *Watts* v. *Malatesta* (262 N. Y. 80, 82) the court said: " The evil which the law chiefly condemns (N. Y. Const., art. I, § 9) and makes criminal (Penal Law, art. 88) is betting and gambling organized and carried on as a systematic business."

The courts of New York will generally enforce contracts made in other jurisdictions. The validity of such contracts is deter-

---

* The paucity of decisions may, perhaps, be explained by the fact that the payment of gambling debts is considered by many as a point of honor; by the success of extrajudicial collection methods or by a tacit realization of the reluctance of appellate courts to enforce such obligations.

mined by the law of the place where the contracts are made. (*United States Mtge. & Trust Co.* v. *Ruggles,* 258 N. Y. 32; *Straus & Co.* v. *Canadian Pacific Ry. Co.,* 254 N. Y. 407.) But as the court in the *Straus & Co.* case said (p. 414) : " There is, however, a well-established exception to the rule to the effect that a court will not enforce a contract though valid where made if its enforcement is contrary to the policy of the forum. (*People* v. *Martin,* 175 N. Y. 315; Williston on Contracts, vol. 3, § 1792.) "

The classic statement of the public policy doctrine is contained in *Loucks* v. *Standard Oil Co.* (224 N. Y. 99, 111) where CARDOZO, J., wrote: " The courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness. They do not close their doors unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal."

In section 612 of the Restatement, Conflict of Laws the rule is stated as follows: " No action can be maintained upon a cause of action created in another state the enforcement of which is contrary to the strong public policy of the forum."

As an illustration of the rule, the Restatement gives this example: " 1. By the law of state X, gambling debts may be recovered; by the law of state Y, to allow recovery on such debts would be against public policy. A sues B in Y on a gambling debt incurred in X. Judgment for B."

In the volume of New York Annotations of the Restatement on Conflict of Laws it is noted that section 612 of the Restatement " is in accord with the law of New York " (p. 386). (See, also, Leflar, Conflict of Laws [1959], § 48, pp. 80–83.)

The " public policy " limitation of the operation of the choice of law has been the subject of much comment in the recent literature of the law. (See Paulsen and Sovern, " Public Policy " in the Conflict of Laws [1956], 56 Col. L. Rev. 969; Ehrenzweig, Contracts in the Conflicts of Laws [1959], 59 Col. L. Rev. 973; Lorenzen, Territoriality, Public Policy and the Conflict of Laws [1924], 33 Yale L. J. 736; Beach, Uniform Interstate Enforcement of Vested Rights [1918], 27 Yale L. J. 656; 2 Rabel, Conflict of Laws: A Comparative Study, ch. 33, pp. 551–591.)

There is no undeviating and precise definition of such a general term as " strong public policy." In *People* v. *Hawkins* (157 N. Y. 1, 12) it was stated: " Therefore, when we speak of the public policy of the state, we mean the law of the state, whether found in the Constitution, the statutes or judicial records ". (See, also, *Building Serv. Union* v. *Gazzam,* 339 U. S. 532, 537.)

In *Kilberg* v. *Northeast Airlines* (9 N Y 2d 34, 39) DESMOND, Ch. J., found that the prohibition of any limitation of the amount to be recovered in a wrongful death action, contained in our State Constitution, represented a public policy which was " strong, clear and old." Reference was made to the fact that the provision had been in the Constitution since 1894 and that each later revision of the State Constitution had included the same provision. The court refused to apply so much of the Massachusetts law — where the death had occurred — that limited damages, because the Massachusetts statute was " so completely contrary to our public policy " (p. 40).

The anti-gambling clause of the State Constitution is of the same venerable vintage as the wrongful death action provision and has also been included in all later revisions of the Constitution. Thus the prohibition against gambling represents, not just a temporary fancy, but a deep-rooted policy to which courts should give constructive effect. That long-standing policy regards gambling as a tainted transaction and there is no hint either in the Constitution or the Penal Law that the courts should purge the taint and ignore the policy when an out-of-State transaction is involved.

In *Watts* v. *Malatesta* (262 N. Y. 80, *supra*) where in an action by one to recover losses from a professional gambler the court refused to permit the defendant to set off the plaintiff's winnings, the court (p. 83) characterized the professional gambler in the following language: " whatever his shape may be, he is an outlaw." The same conclusion was reached in *Hofferman* v. *Simmons* (290 N. Y. 449, 456). It would indeed be a perversion of public policy to permit recovery in a court of law by one whom the courts consider an " outlaw " solely because the gambling occurred beyond the State line. The constitutional command should not be so obliquely nullified or disregarded and its clear public policy ignored. What is presented in the instant case is not merely a difference in laws between New York and Puerto Rico but a deep-rooted inconsistency between our domestic principles and those of jurisdictions where public gambling may be permitted.

The precise question posed herein has been considered by the lower courts in this State. In *Nielsen* v. *Donnelly* (110 Misc. 266) the court refused to enforce a gambling agreement made in Louisiana, where such agreements were valid. In *Tropicales, S. A.* v. *Milora* (7 Misc 2d 281) and *Tropicales, S. A.* v. *Drinkhouse* (15 Misc 2d 425) it was concluded that gambling debts incurred in Cuba, where the transactions were valid, were subject to action in New York. While the *Tropicales* cases could be dis-

tinguished,* there is implicit in those decisions the notion that the enforcement in this State of gambling debts incurred in Cuba is not contrary to our public policy.

We believe the *Nielsen* case reached the correct result. There is a conflict of authority on the general question among the courts of the various States. (11 Am. Jur., Conflict of Laws, § 136; Anno. 173 A. L. R. 695.) In the 173 A. L. R. annotation to the case of *Ciampittiello* v. *Campitello* (134 Conn. 51) it is stated (p. 696) : '' The prevailing view seems to be to regard statutes declaring gambling contracts and transactions illegal or void, as embodying a distinctive public policy, which requires the court of the state or country in which they are enacted to refuse to recognize or enforce any contract or transaction in violation of their terms, even though such contract or transaction may have had its situs outside the forum, and therefore does not come within the direct operation of the statutes.''

We hold that the clear public policy of this State will not permit suit in our courts to recover on a gambling debt which arose in a professional gambling house even though the gambling was legal where the debt allegedly arose.

Trial Term evidently considered that the legalizing of parimutuel betting and the operation of bingo games in this State had somehow weakened the force of our public policy against gambling. The carving out of the exceptions to the constitutional prohibition against gambling was for limited and restrictive purposes. In the case of pari-mutuel betting the purpose was to provide revenue for the support of the government and in the bingo and lotto amendment the aim was to aid charitable organizations to raise funds. The operations of these two types of activities are hedged in by strict legislative requirements.

In the light of the history and purpose of the amendments permitting pari-mutuel betting and bingo, it cannot be inferred that when the amendments were adopted, and the other provisions of subdivision 1 of section 9 of article I of the Constitution were left unchanged, that there was any intent to displace the prohibition against gambling beyond those specified. The enact-

---

* The *Drinkhouse* case does not discuss the question of public policy and in effect relies on the decision in *Milora*. In the *Milora* case, it was ruled that it was not established that the check was issued in payment of a gambling debt. Hence, the opinion, insofar as it deals with the conflict of laws problem, is dictum. Since in both *Milora* and *Drinkhouse,* the actions were on checks payable in New York, the causes of action arose in New York (*Gonzalez* v. *Industrial Bank* [*of Cuba*], 12 N Y 2d 33) and there could not properly be any recovery on checks founded upon a consideration that was illegal in the place of performance (*Thuna* v. *Wolf,* 132 Misc. 56).

ment of the constitutional exceptions must be deemed as an affirmation of the continuance of the residual constitutional prohibition against gambling. The limited exceptions give no hint of any constitutional or legislative intent to devitalize the remaining provisions of subdivision 1 of section 9 of article I of the Constitution prohibiting gambling. The unqualified command of the Constitution expresses a clear and deep-rooted policy against gambling. Our courts may not place out-of-State gambling transactions, such as are involved here, on any different footing from domestic gambling, if the public policy of the forum is properly to be served.

In view of our conclusion that plaintiff may not recover in our courts upon the gambling debt herein, it becomes unnecessary to discuss the collateral question of whether in any event, there could be recovery on that portion of the action based on the $3,000 check. Since the check was payable in New York, the cause of action arose in this State (*Gonzalez* v. *Industrial Bank [of Cuba]*, 12 N Y 2d 33, *supra*; *Hibernia Nat. Bank* v. *Lacombe*, 84 N. Y. 367) and, under New York law, there could be no recovery on the check (*Thuna* v. *Wolf*, 132 Misc. 56, *supra*).

The judgment should therefore be reversed, on the law, and the complaint dismissed, with costs to appellant.

STEVENS, J. (dissenting). Plaintiff sued here for the recovery of the total sum of $12,000. The first cause of action to recover the sum of $3,000 was based upon a check made and delivered by defendant in Puerto Rico to the plaintiff. The other causes of action were to recover the total sum of $9,000 which defendant had lost at gaming in the plaintiff's establishment in Puerto Rico. Defendant had established a credit before the losses, which he asserted was limited to $7,000. The money was given directly to defendant as he requested it while gambling. It is not disputed that the $12,000 represented a loss at gaming, and that gaming is legal in Puerto Rico. Thus the consideration for the contract was good according to *lex loci*.

On this appeal by defendant from a judgment for plaintiff, defendant-appellant asserts gambling is a heinous offense, repulsive to New York's concept of morality, contrary to its public policy and is unenforcible here.

The single question is whether the general principle that a contract will be upheld whenever possible (sometimes referred to as the Rule of Validation) applies here, or whether enforcement must be denied for some or all of the reasons advanced by appellant. Should New York, as a matter of comity, recognize the obligation?

No question of the individual view as to the morality or rightness of gambling is involved. The bases of rejection must be broader. "To render foreign law unenforceable as contrary to public policy, it must violate some fundamental principle of justice, some prevalent conception of good morals, or some deep-rooted tradition of the common weal." (8 N. Y. Jur., Conflict of Laws, § 4; *Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 111.) The mere fact that a contract sought to be enforced would be illegal if such contract had been made in New York, is not alone sufficient grounds to deny recovery (*Thatcher* v. *Morris*, 11 N. Y. 437 [1854]). In the *Thatcher* case, plaintiff sought to recover the amount of prizes drawn by tickets in a Maryland lottery. At that time lotteries were illegal in New York. The court denied recovery because the plaintiff failed to plead and prove the legality and validity of the contract where made and that it was to be performed without the State. If such had been shown, the contract would have been upheld though illegal in New York, the court saying in such instance: "[i]t is as if an exception had been engrafted upon the statute * * * excluding from its operation all contracts made without the state" (*ibid*, p. 439). In the case on appeal, the pleading and proof met the test enunciated in *Thatcher* v. *Morris* (*supra*). (Cf. *Russell* v. *Societe Anonyme des Etablissements Aeroxon*, 268 N. Y. 173 [1935], which involved Statute of Frauds, but, also, cited *Thatcher* v. *Morris* [p. 182]; *Harris* v. *White*, 81 N. Y. 532; *Ormes* v. *Dauchy*, 82 N. Y. 443, which held an agreement for publication of lottery advertisements outside New York State is enforcible in the courts of New York.)

"At common law gambling was neither illegal nor considered immoral. This may account for the fact that prohibiting legislation has usually been held not sufficiently expressive of forum policy to invalidate gambling agreements entered into outside the forum. In England, and in the majority of American jurisdictions, the Rule of Validation has prevailed." (Ehrenzweig, Conflict of Laws, p. 482.) "Cases in which a strong forum policy is given effect to invalidate a contract valid under a pertinent foreign law, are becoming increasingly rare and may be virtually limited to contracts concluded outside the forum for the very purpose of evading the forum's law." (Ehrenzweig, Conflict of Laws, p. 474.) No contention is advanced here that the contract was entered in order to evade the laws of New York.

It can hardly be argued with any degree of validity that enforcement of the contract here involved would tend to disturb the peace, require the production of indecent evidence to support it, be in sharp and substantial conflict with the morals of the age

or be inconsistent with the established interests of society in general. Certainly it does not affect the pecuniary or the legal interests of the community. A common-sense appraisal of the requirements of justice, the contract having been fully and validly entered, would support its enforcement.

The doctrine of *Nielson* v. *Donnelly* (110 Misc. 266 [1920]) upon which appellant places great stress, is of doubtful validity in the present state of our law. (See *Thuna* v. *Wolf*, 132 Misc. 56 [1928], where the Appellate Term, in reversing *Thuna* v. *Wolf*, 130 Misc. 306, in which recovery had been allowed upon a check given in Florida in payment of a gambling debt, said the check was an executory contract and governed by the laws of New York.) The court referred to the fact that it was not a family or friendly game, and a contention had been advanced that there was cheating. Since it was given for an illegal consideration it would not be enforced. The court said: " [h]ad plaintiff sued on the contract rather than on the check, it might perhaps have been presumed that such a gambling debt is valid in Florida and an argument might be made that it could be enforced in the courts of this State. (\* \* \* *Thatcher* v. *Morris*, 11 N. Y. 437 ") (p. 57); see, also, *Tropicales, S. A.* v. *Drinkhouse,* 15 Misc 2d 425 (1959), recovery allowed upon a check given for a gambling debt; cf. *Tropicales, S. A.* v. *Milora,* 7 Misc 2d 281.

As to judgments of a sister State, the general view is that such judgment is entitled to full faith and credit even " though the cause of action upon which the judgment was based is against the law and public policy of the state or territory in which enforcement is sought " (Goodrich, Conflict of Laws [3d ed.], pp. 620–621; *Fauntleroy* v. *Lum,* 210 U. S. 230). " The result ", says Goodrich, " while not comforting to local prejudices, seems an extremely desirable one from the broader point of view " (p. 621).

It is recognized, in the instant case, the claim was not reduced to judgment when plaintiff sought to utilize our judicial facilities. But if the general principle is applicable, redress should not be denied. " Indeed, in these days [one] cannot afford to be too pious about this matter of gambling [and] to be shocked or to prate of public morals or public policy when confronted with an application for relief upon a contract lawful at the place of its performance " (Ehrenzweig, Conflict of Laws, § 181, p. 482, citing *Nevcal Enterprises* v. *Cal-Neva Lodge,* 194 Cal. App. 2d 177). The observation quoted is of especial pertinency when the forum, as here, recognizes gambling in divers forms, though not cards or dice, as is here involved. Whether the reason assigned for the

deviation be "improvement of the breed" or revenue (horse racing), or the fostering and aiding of charity or religious causes (bingo), the stark fact is that gambling is permitted. Thus, gambling per se is not so contrary to public policy or so offensive to public morals as to demand complete prohibition. Nor should judicial process be denied when one seeks to enforce an obligation of this nature, valid at the place of creation. The identity of the beneficiary and the avowed purpose, rather than the nature of the activity, governs the attitude of New York toward gambling.

The constitutional prohibition, and permissive exceptions (N. Y. Const., art. I, § 9) are guidelines of conduct for, and limitations on, activity of the citizenry of New York within the territorial borders of the State. Such prohibition and exceptions do not, and were never intended to, proscribe the citizens' activity without the confines of this State. New York does not hold, as an absolute, that gambling is injurious to the interests of the State, or contrary to the public good, for the revenue derived from pari-mutuel betting is to be used for the support of government. To condemn by implication, or nonrecognition of the validity of the contract, the laws of another State which has merely gone a step further in its permitted exceptions, is to erect a standard of dubious value.

The judgment appealed from should be affirmed, though there may be some doubt as to the $3,000 represented by the check which is an executory contract.

RABIN and NOONAN, JJ., concur with VALENTE, J.; STEVENS, J., dissents in opinion in which BREITEL, J. P., concurs.

Judgment reversed, on the law, and the complaint dismissed, with costs to appellant.