*854 OPINION OF THE COURT
Charles Edward Ramos, J.
This proceeding is brought by the Attorney General of the State of New York (the Attorney General or the State of New York), pursuant to Executive Law § 63 (12) and General Business Law article 23-A, to enjoin the respondents, World Interactive Gaming Corporation (WIGC), Golden Chips Casino, Inc. (GCC), and their principals, officers, and directors from operating within or offering to residents of New York State gambling over the Internet. The State also seeks to enjoin respondents from selling unregistered securities in violation of General Business Law § 352 (also known as the Martin Act).
The central issue here is whether the State of New York can enjoin a foreign corporation legally licensed to operate a casino offshore from offering gambling to Internet users in New York. At issue is section 9 (1) of article I of the New York Constitution which contains an express prohibition against any kind of gambling not authorized by the State Legislature. The prohibition represents a deep-rooted policy of the State against unauthorized gambling (Intercontinental Hotels Corp. v Golden, 18 AD2d 45 [1st Dept 1963], revd on other grounds 15 NY2d 9 [1964]).
WIGC is a Delaware corporation that maintains corporate offices in New York. WIGC wholly owns GCC, an Antiguan subsidiary corporation which acquired a license from the government of Antigua to operate a land-based casino. Through contracts executed by WIGC, GCC developed interactive software, and purchased computer servers which were installed in Antigua, to allow users around the world to gamble from their home computers. GCC promoted its casino at its web site, and advertised on the Internet and in a national gambling magazine. The promotion was targeted nationally and was viewed by New York residents.
In February 1998, the Attorney General commenced an investigation into the practices of WIGC. The investigation was prompted by an inquiry from the Texas State Securities Board which informed the Attorney General that WIGC was making unsolicited telephone calls to the public and disseminating offering materials for WIGC’s securities. The petition alleges that respondents were attempting to sell what they termed a “private subscription offering,” which consisted of 700,000 shares of “convertible preferred stock” at a price of $5 per share. The respondent’s primary method of selling units *855 of WIGC stock involved cold-calling prospective investors. The prospective investors were located throughout the United States, including New York. Respondents do not dispute that the calls originated from WIGC’s headquarters in Bohemia, New York. At no time was this offering or the cold-calling registered with New York State as required by law.
During telephone solicitation, respondents claimed that investors would earn 20% annual dividend on their investment, 25% profit sharing and an initial public offering (IPO) of WIGC’s stock, which would likely take place within one year. Respondents also compared WIGC’s projected stock price and earnings to that of land-based casinos. Respondents represented the profit margins of other Internet casinos at around 80-85%. Respondents told investors that WIGC would earn an estimate of up to $100,000 in revenue during the first year. Respondents claimed that the investment was conservative.
Together, respondents sold approximately $1,843,665 worth of shares to approximately 114 investors throughout the country, including approximately $125,000 worth of shares to 10 New York State residents.
In June 1998, the Attorney General furthered its investigation by logging onto respondents’ web site, downloading the gambling software, and in July 1998, placed the first of several bets. Users who wished to gamble in the GCC Internet casino were directed to wire money to open a bank account in Antigua and download additional software from GCC’s web site. In opening an account, users were asked to enter their permanent address. A user which submitted a permanent address in a State that permitted land-based gambling, such as Nevada, was granted permission to gamble. Although a user which entered a State such as New York, which does not permit land-based gambling, was denied permission to gamble, because the software does not verify the user’s actual location, a user initially denied access could easily circumvent the denial by changing the State entered to that of Nevada, while remaining physically in New York State. The úser could then log onto the GCC casino and play virtual slots, blackjack or roulette. This raises the question if this constitutes a good-faith effort not to engage in gambling in New York.
The Attorney General commenced this action pursuant to Executive Law § 63 (12) and General Business Law article 23-A. Petitioner seeks: (1) to enjoin respondents from conducting a business within the State of New York until they are properly registered with the Secretary of State to conduct busi *856 ness in New York; (2) to enjoin respondents from running any aspect of their Internet gambling business within the State of New York; (3) to be awarded restitution and damages to injured investors; and (4) to be awarded penalties and costs to the State of New York for violations of New York State’s Securities Law (General Business Law § 352, also known as the Martin Act), Federal and State laws prohibiting gambling, and New York State’s Executive Law.
Respondents move to dismiss the petition on the grounds that (1) the Attorney General lacks the authority to bring a proceeding under Executive Law § 63 (12), where a pattern of repeated or persistent fraud or illegal conduct is absent; (2) lack of personal jurisdiction over WIGC and GCC; and (3) lack of subject matter jurisdiction to prosecute alleged violations of the Federal Interstate Wire Act (18 USC § 1084 [a] [Wire Act]), the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprising Act (18 USC § 1952 [Travel Act]), and the Interstate Transportation of Wagering and Paraphernalia Act (18 USC § 1953 [Paraphernalia Act]).
Respondents contend that the transactions occurred offshore and that no State or Federal law regulates Internet gambling. They claim that they were operating a duly licensed legitimate business fully authorized by the government of Antigua and in compliance with that country’s rules and regulations of a land-based casino. They further argue that the Federal and State laws upon which the State relies either do not apply to the activities of WIGC or are too vague and ambiguous to criminalize the activity of Internet gambling, when such activity is offshore in Antigua.
Executive Law
Executive Law § 63 (12) authorizes the Attorney General to bring a special proceeding against a person or business committing repeated or persistent fraudulent or illegal acts. Any conduct which violates State or Federal law or regulation is actionable under this provision (see, Matter of State of New York v Ford Motor Co., 74 NY2d 495 [1989]). Under Executive Law § 63 (12), fraud has been interpreted broadly requiring only a showing that the action has a potential to deceive (see, People v Apple Health & Sports Clubs, 206 AD2d 266, 267 [1st Dept 1994]). In order for fraudulent or illegal acts to be actionable under Executive Law § 63 (12), respondents’ activities must be repeated (see, State of New York v Princess Prestige Co., 42 NY2d 104, 107-108 [1977] [finding that Executive Law § 63 *857 (12) does not require a large number of repeated illegal or fraudulent acts]).
In order to defeat the petition, respondents must present facts having probative value “sufficient to demonstrate an unresolved material issue which can be determined only at a plenary trial.” (Matter of State of New York v Waterfine Water Conditioning Co., 87 Misc 2d 18, 19 [Sup Ct, Albany County 1975]; compare, Matter of Lefkowitz v McMillen, 57 AD2d 979 [3d Dept 1977].) Respondents have failed to submit evidence of any probative value to refute the allegations of the petition.
Personal Jurisdiction Over WIGC and GCC
Although at first glance Internet transactions may appear novel, “traditional jurisdictional standards have proved to be sufficient to resolve all civil Internet jurisdictional issues” (People v Lipsitz, 174 Misc 2d 571, 578 [Sup Ct, NY County 1997]).
The Internet is at least a medium through which individuals may obtain and transmit text, sound, pictures, moving video images, and interactive services using various methods. The Internet also allows individuals to trade securities, execute banking transactions, purchase consumer merchandise, and engage in many other types of business and personal dealings not possible using more traditional means. What makes Internet transactions shed their novelty for jurisdictional purposes is that similar to their traditional counterparts, they are all executed by and between individuals or corporate entities which are subject to a court’s jurisdiction.
WTiether the exercise of personal jurisdiction comports with due process requirements depends, as in any case, upon a finding that respondent has purposefully engaged in significant activities such that he has “availed himself of the privilege of conducting business [in the forum State].” (Burger King Corp. v Rudzewicz, 471 US 462, 476 [1985].) “The test, though not ‘precise’ * * * is a ‘simple pragmatic one’ [citations omitted]: [it’s] the aggregate of the corporation’s activities in the State such that it may be said to be ‘present’ in the State ‘not occasionally or casually, but with a fair measure of permanence and continuity.’” (Laufer v Ostrow, 55 NY2d 305, 310 [1982], quoting Tauza v Susquehanna Coal Co., 220 NY 259 [1917]; see also, Matter of American Dental Coop. v Attorney General of State of N. Y, 127 AD2d 274, 280 [1st Dept 1987].)
Respondents in this case are clearly doing business in New York for purposes of acquiring personal jurisdiction. Although *858 WIGC was incorporated in Delaware, WIGC operated its entire business from its corporate headquarters in Bohemia, New York. All administrative and executive decisions as well as the computer research and development of the Internet gambling web site were made in New York. The cold-calls to investors to buy WIGC stock were made by WIGC agents employed and operating from this location. Thereafter, respondents sent the prospectus and other solicitation materials about Internet gambling from the Bohemia, New York location. WIGC’s continuous and systematic contacts with New York established their physical presence in New York.
Moreover, even without physical presence in New York, WIGC’s activities are sufficient to meet the minimum contacts requirement of International Shoe Co. v Washington (326 US 310, 316 [1945]). The nature and quality of the defendant’s activity must be such that “the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws” (Agrashell, Inc. v Sirotta Co., 344 F2d 583, 587 [2d Cir 1965]). The use of the Internet is more than the mere transmission of communications between an out-of-State defendant and a plaintiff within the jurisdiction.
WIGC and the other respondents are doing business in New York. They worked from New York in conjunction with another New York-based company, Imajix Studios, to design the graphics for their Internet gambling casino. From their New York corporate headquarters, they downloaded, viewed, and edited their Internet casino web site. Furthermore, respondents engaged in an advertising campaign all over the country to induce people to visit their web site and gamble. Knowing that these ads were reaching thousands of New Yorkers, respondents made no attempt to exclude identifiable New Yorkers from the propaganda. Phone logs from respondents’ toll-free number (available to casino visitors on the GCC web site) indicate that respondents had received phone calls from New Yorkers. Respondents cannot dispute that they do business in New York and that the acts complained of are subject to this court’s jurisdiction.
To establish in personam jurisdiction over GCC, the petitioner must show that GCC functioned merely as the alter ego of WIGC. The corporate form will be pierced only if one corporation is so controlled by the other as to be a mere agent, department or alter ego of the other. (See, e.g., Frummer v Hilton Hotels Intl., 19 NY2d 533, 537 [1967]; see also, Gonzales v *859 Ametek, Inc., 50 Misc 2d 62, 65-67 [Sup Ct, Queens County 1966]; ABKCO Indus. v Lennon, 52 AD2d 435, 440 [1st Dept 1976].) There must be some proof that the parent company dominates or controls the daily activities of the subsidiary (Delagi v Volkswagenwerk A.G., 29 NY2d 426 [1972]; Taca Intl. Airlines v Rolls-Royce of England, 15 NY2d 97 [1965]; Billy v Consolidated Mach. Tool Corp., 51 NY2d 152 [1980]).
The evidence indicates that GCC is a corporation completely dominated by WIGC. Aside from it being a wholly owned subsidiary of WIGC, GCC’s primary asset, the web site, was purchased by WIGC pursuant to a corporate decision by WIGC’s chief executive officer (CEO), respondent Mr. Burton. The use of the GCC casino web site was handled from WIGC’s corporate headquarters. From WIGC’s New York office, respondents also actively solicited investors to buy WIGC shares. Although WIGC was conducting operations from New York, WIGC failed to register with the State: as a foreign corporation doing business in New York, the stock offering, the brokers, dealers, issuers, or salespersons for the offering. All GCC top employees were hired by and reported to WIGC. WIGC itself contracted to buy GCC casinos web site servers from AIE. Whenever GCC’s servers required servicing, AIE provided GCC with services pursuant to a contract executed between WIGC and AIE. Furthermore, the licensing agreement with AIE was executed by respondent Burton as CEO of WIGC and GCC. At no time were any formalities observed to maintain a financial distinction between the two entities. GCC did not repay WIGC for the purchase of computer servers, nor did GCC execute any formal documents to commemorate the transfer sale of the servers. Therefore, the corporate form is disregarded and GCC will be deemed an alter ego of WIGC.
Subject Matter Jurisdiction and Application of New York Law
Respondents argue that the court lacks subject matter jurisdiction, and that Internet gambling falls outside the scope of New York State gambling prohibitions, because the gambling occurs outside of New York State. However, under New York Penal Law, if the person engaged in gambling is located in New York, then New York is the location where the gambling occurred (see, Penal Law § 225.00 [2]). Here, some or all of those funds in an Antiguan bank account are staked every time the New York user enters betting information into the computer. It is irrelevant that Internet gambling is legal in Antigua. The act of entering the bet and transmitting the in *860 formation from New York via the Internet is adequate to constitute gambling activity within New York State.
Wide range implications would arise if this court adopted respondents’ argument that activities or transactions which may be targeted at New York residents are beyond the State’s jurisdiction. Not only would such an approach severely undermine this State’s deep-rooted policy against unauthorized gambling, it also would immunize from liability anyone who engages in any activity over the Internet which is otherwise illegal in this State. A computer server cannot be permitted to function as a shield against liability, particularly in this case where respondents actively targeted New York as the location where they conducted many of their allegedly illegal activities. Even though gambling is legal where the bet was accepted, the activity was transmitted from New York. Contrary to respondents’ unsupported allegation of an Antiguan management company managing GCC, the evidence also indicates that the individuals who gave the computer commands operated from WIGC’s New York office. The respondents enticed Internet users, including New York residents, to play in their casino.
As for respondents’ claim that none of the Federal statutes apply to operation of an Internet casino licensed by a foreign government, there is nothing in the record or the law to support their contentions. To the contrary, the Wire Act, Travel Act and Paraphernalia Act all apply despite the fact that the betting instructions are transmitted from outside the United States over the Internet. The scope of each of these statutes clearly extends to the transmission of betting information to a foreign country (see, the Wire Act which prohibits use of “a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers” [18 USC § 1084 (a)]; the Travel Act which prohibits the use of “any facility in interstate or foreign commerce” with intent to promote any unlawful activity [18 USC § 1952 (a)]). Nor can it be convincingly argued by respondents that the Federal statutes are unconstitutionally vague (see, Turf Ctr. v United States, 325 F2d 793, 795 [9th Cir 1963]; Katz v United States, 369 F2d 130, 135 [9th Cir 1966]; United States v Mendelsohn, 896 F2d 1183, 1186 [9th Cir 1990]). Because the Wire Act, the Travel Act and the Paraphernalia Act have all been found to be constitutionally valid, and have been found not to be overly broad or vague, and because respondents’ conduct falls within the scope of New York’s prohibition against gambling, all of these statutes apply to respondents’ activities.
*861 The evidence demonstrates that respondents have violated New York Penal Law which states that “[a] person is guilty of promoting gambling * * * when he knowingly advances or profits from unlawful gambling activity” (Penal Law § 225.05). By having established the gambling enterprise, and advertised and solicited investors to buy its stock and to gamble through its on-line casino, respondents have “engage [d] in conduct which materially aids * * * gambling activity,” in violation of New York law (Penal Law § 225.00 [4] [which states “conduct includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device * * * (or) toward the solicitation or inducement of persons to participate therein”]). Moreover, this court rejects respondents’ argument that it unknowingly accepted bets from New York residents. New York users can easily circumvent the casino software in order to play by the simple expedient of entering an out-of-State address. Respondents’ violation of the Penal Law is that they persisted in continuous illegal conduct directed toward the creation, establishment, and advancement of unauthorized gambling. The violation had occurred long before a New York resident ever staked a bet. Because all of respondents’ activities illegally advanced gambling, this court finds that they have knowingly violated Penal Law § 225.05.
Not only are respondents guilty of violating New York State’s gambling laws but they have also violated several Federal laws. Like the great majority of States, Federal law also proscribes gambling. Statutes such as the Wire Act, the Travel Act and the Paraphernalia Act are just three examples of the Federal Government’s policy against gambling. As the Wire Act’s legislative history states: “The purpose of the bill is to assist various States and the District of Columbia in the enforcement of their laws pertaining to gambling, bookmaking, and like offenses and to aid in the suppression of organized gambling activities by prohibiting the use of wire communication facilities which are or will be used for the transmission of bets or wagers and gambling information in interstate and foreign commerce.” (HR Rep No. 967, 87th Cong, 1st Sess, reprinted in 1961 US Code Cong & Admin News 2631; see also, Telephone News Sys. v Illinois Bell Tel. Co., 220 F Supp 621 [1963], affd 376 US 782.)
The Wire Act bars citizens from engaging “in the business of betting or wagering knowingly us[ing] a wire communication for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wa *862 gers.” (18 USC § 1084 [a].) A Wire Act violation occurs when a defendant is in the business of betting or wagering (see, United States v Anderson, 542 F2d 428 [7th Cir 1976]).
Furthermore, the Travel Act (18 USC § 1952) proscribes similar interstate gambling activity by stating:
“[the] us[e of] * * * any facility in interstate or foreign commerce, including the mail, with intent to * * *
“(1) distribute the proceeds of any unlawful activity * * * or
“(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity * * *
“shall be fined not more than $10,000 or imprisoned for not more than five years, or both.”
Respondents’ interstate use of the Internet to conduct their illegal gambling business violates Federal law. As the legislative history behind the Wire Act indicates, the purpose of these Federal controls is to aid the States in controlling gambling. Like a prohibited telephone call from a gambling facility, the Internet is accessed by using a telephone wire. When the telephone wire is connected to a modem attached to a user’s computer, the user’s phone line actually connects the user to the Internet server and then the user may log onto this illegal gambling web site from any location in the United States. After selecting from the multitude of illegal games offered by respondent, the information is transmitted to the server in Antigua. Respondents’ server then transmits betting information back to the user which is against the Wire Act. The Internet site creates a virtual casino within the user’s computer terminal. By hosting this casino and exchanging betting information with the user, an illegal communication in violation of the Wire Act and the Travel Act has occurred.
Respondents attempt to circumvent Federal law by asserting that none of these statutes apply to the operation of an Antiguan casino. Moreover, they allege the Federal Government has not explicitly ruled on Internet gambling, and therefore it is an unregulated field. Respondents disregard that the Interstate Commerce Clause gives Congress the plenary power to regulate illegal gambling conducted between a location in the United States and a foreign location. (See, Champion v Ames, 188 US 321, 334 [1903].) Gambling conducted via the Internet from New York to Antigua is indistinguishable from any other form of gambling since both the Wire Act and Travel Act apply to the transmission of information into a foreign country. (See, *863 18 USC § 1084 [a]; § 1953 [a].) Therefore, the respondents are culpable of violating the Wire Act and the Travel Act.
Additionally, respondents violated the Paraphernalia Act. Under this Act: “[w]hoever, except a common carrier in the usual course of business, knowingly carries or sends in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for use in (a) bookmaking; or (b) wagering pools with respect to a sporting event; or (c) in a numbers, policy, bolita, or similar game shall be fined under this title or imprisoned for not more than five years or both.” (18 USC § 1953 [a].) The respondents intentionally sent records of gambling activity from the GCC location in Antigua through international and interstate commerce into various United States locations, among them New York. When respondents solicited prospective investors, they sent them a multitude of materials which were specifically to be utilized for the setting up and advancing of the Internet gambling business through United States mail. Furthermore, the actual computers which would be used for gambling between the United States and Antigua were bought and delivered through United States mail from Florida to GCC’s location in Antigua.
The respondents’ total activities unambiguously advance gambling in direct violation of the explicit safeguards that New York and the Federal laws have placed against unauthorized gambling activity.
In addition, several of New York’s registration requirements have been violated. For instance, under Business Corporation Law § 1301 (a), a “foreign corporation shall not do business in this state until it has been authorized to do so” by submitting an application to the Department of State. WIGC is a foreign corporation, incorporated in Delaware, operating out of offices in Bohemia, New York. Since WIGC failed to apply for approval from the Department of State, the respondents were repeatedly operating illegally in New York State.
Moreover, pursuant to the Martin Act, the issuer, dealer and salesmen of securities must all be registered with the Attorney General prior to the solicitation of investors. General Business Law § 359-e (1) (a) defines a dealer as “a person, firm, association or corporation selling or offering for sale from or to the public within or from this state securities issued by it.” Respondents acted as the issuers, dealers and salesmen when they sold units of WIGC stock from their office in New York *864 without registering. Respondents frivolously claim they are exempt from registering under the Martin Act due to General Business Law § 359-f. However, they fail to point to any applicable exception under General Business Law § 359-f. Furthermore, although a company failing to register is normally penalized with a fine and subsequently the company is often allowed to file for registration, the violation still constitutes a fraudulent practice under New York law (see, General Business Law § 359-e [14] [Z]).
This court further finds that respondents also violated the Martin Act’s prohibition against the use of deception, misrepresentations, or concealment in the sale of securities (see, General Business Law § 352 [1]). It is well settled that fraud exists not only where there has been an affirmative misstatement of a material fact, but also where there has been an omission of a material fact (see, General Business Law § 352-c [1]; TSC Indus. v Northway, Inc., 426 US 438 [1976]; State of New York v Rachmani Corp., 71 NY2d 718, 727 [1988]). While the evidence does not conclusively show that respondents misrepresented to investors certain facts about the potential return on their investment, the likelihood of an IPO, or the legality of Internet gambling, respondents did misrepresent and failed to disclose facts regarding the use of proceeds raised in the offering.
It is undisputed that approximately 46% of the investors’ funds were used to pay respondents’ commissions, salaries, and consulting fees. Without disclosing to investors, individual respondent Jeffrey Burton, CEO and director of WIGC, received a personal loan of $84,000 from the corporation. Respondent Cynthia Burton, Jeffrey Burton’s wife and a secretary at WIGC, drew a salary of $93,439 from WIGC over a mere seven-month period. Respondent Lawrence Blocker, president and director at WIGC, received $135,864 in salary, commissions and fees. Respondents Gregory Flemming, Sr., Gerald Varland, and Howard Toomer, all vice-presidents of marketing, took substantial salaries of $242,260, $109,650, and $71,260, respectively. In addition, the individual respondents created various business entities through which they paid themselves undisclosed consultant fees.
Not only were none of these salaries disclosed to investors, the respondents’ offering materials indicated that only 18% of the offering proceeds would be used as. working capital and to pay commissions. Had investors known that 46% of the funds raised were being paid to respondents in the form of salaries, commissions and consulting fees, they might well have chosen *865 to forego the investment (compare, People v Tellier, 7 Misc 2d 43 [Sup Ct, NY County 1956]; Grandon v Merrill Lynch & Co., 147 F3d 184 [2d Cir 1998]).
Because of the clear illegality present in respondents’ actions, and the absence of any triable issue of fact, respondents are found liable under Executive Law § 63 (12) for their State and Federal law violations.
Remedies
The Attorney General is entitled to injunctive relief which is routinely granted in special proceedings under Executive Law § 63 (12) (People v Apple Health & Sports Clubs, 206 AD2d 266 [1st Dept 1994], lv dismissed in part, denied in part 84 NY2d 1004 [1994], supra). The requirement of a bond to assure future proper behavior on the part of an enjoined party traditionally accompanies such an injunction (see, People v Empyre Inground Pools, 227 AD2d 731 [3d Dept 1996]; People v Helena VIP Personal Introductions Servs., 199 AD2d 186 [1st Dept 1993]). This court finds the request for an injunction warranted, and directs fixing of the amount be incorporated in an order to be settled.
As for the Attorney General’s request for restitution, penalties, and costs, which are available under Executive Law § 63 (12) and General Business Law § 353 (3), this court finds the circumstances warrant awarding them in this case. The manner of the accounting, the mechanism for restitution, and the amount in penalties and costs to be awarded shall be resolved at a hearing.
Because each respondent is individually liable for the actions conducted by both WIGC and GCC (see, e.g., Matter of State of New York v Daro Chartours, 72 AD2d 872, 873 [3d Dept 1979]; see also, Marine Midland Bank v Russo Produce Co., 50 NY2d 31, 44 [1980] [finding that corporate veil can be pierced to hold corporate officers liable for a tort regardless of whether they acted in conjunction with the corporation and in the course of their corporate duties]), and shall be fined appropriately, all parties including individual respondents are directed to appear for a preliminary conference before this court on September 9, 1999, at 9:30 a.m., to resolve any issues regarding the scope of the accounting, discovery, or scheduling of the hearing.
Respondents are further directed not to destroy any personal or business records relating to this matter.