482 A.2d 1

**STATE of Maryland**

v.

**JONATHAN LOGAN, INC.**

**No. 129, Sept. Term, 1983.**

Court of Appeals of Maryland.

Oct. 4, 1984.

Robert W. Hesselbacher, Jr., Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen. and Charles O. Monk, II, Asst. Atty. Gen., Baltimore, on brief), for appellant.

Allan M. Pepper, New York City (Mark Landau and Kaye, Scholer, Fierman, Hays & Handler, New York City, and Peter H. Gunst and Frank, Bernstein, Conaway & Goldman, Baltimore, on brief), for appellee.

Argued before SMITH, ELDRIDGE, COLE, DAVIDSON,* RODOWSKY and COUCH, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (Retired), Specially Assigned.

RODOWSKY, Judge.

The construction of § 11–209(a) of the Maryland Antitrust Act, Md.Code (1975, 1983 Repl. Vol.), §§ 11–201 to 11–213 of the Commercial Law Article (the Md.Act) is the principal question presented in this case.[1] The State of Maryland, acting through the Antitrust Division of the Attorney General's Office and alleging a resale price maintenance conspiracy in raincoats, brought this action under § 11–209(a). The State contends that the section authorizes an equity court to order the alleged price fixer to pay to the State for the benefit of retail purchasers the difference between the price they paid for the raincoats as affected by the conspiracy and the price which they would have paid but for the price fixing. The trial court held, on demurrer, that § 11–209(a) does not permit recovery of that monetary relief. In Part I hereof we shall explain why we agree with

---

* Davidson, J., participated in the hearing and in the conference of the case in regard to its decision, but because of illness did not take part in the adoption of the opinion.

1. All references to Maryland statutes, unless otherwise indicated, are to the Commercial Law Article.

the trial court on that issue. That court also held that the State had failed to state a claim for injunctive relief. In Part II we set forth the reasons for our concurrence in that conclusion.

On March 2, 1981, the State, expressly suing only in its sovereign capacity, filed this action against Jonathan Logan, Inc., (Logan) in the Eighth Judicial Circuit. The complaint described Logan as one of the nation's largest manufacturers of apparel goods which through its Misty Harbor Division sells rainwear to resellers in Maryland and elsewhere throughout the United States. It was alleged that, from "a time prior to 1972 and continuing thereafter at least until April, 1977," Logan had engaged in a combination or conspiracy in unreasonable restraint of trade "to fix, raise and maintain resale prices of [its] rainwear," and that, unless enjoined, the unlawful combination would "continue or be renewed . . . ."

Prayer B of the complaint asked the court to

[r]emove the effect of the violation complained of herein by compelling defendant, pursuant to Md.Com.Law Code Ann. § 11–209(a)(2)(i), to disgorge its ill gotten gains, making full restitution to the consumers of Jonathan Logan's rainwear in the State of Maryland, in an amount as yet undetermined, such amount representing the price paid by those consumers in excess of that which would have been paid but for the aforementioned contract, combination or conspiracy.

Logan demurred on two grounds: (1) section 11–209(a) does not empower the State to recover monetary awards for consumers, and (2) the complaint failed to state a claim for injunctive relief. As to the latter point Logan relied, in part, on a 1979 Federal Trade Commission cease and desist order, the terms of which were broad enough to enjoin

Logan from the same conduct alleged by the State in the instant action.[2]

The circuit court sustained Logan's demurrer but did not prohibit further amendment of the claim for injunctive relief. The State, however, declined further to amend and, in order to eliminate any question concerning appealability of the judgment to be entered, voluntarily dismissed as to all relief other than (1) that sought in prayer B and (2) an appropriate injunction. Thereupon, the trial court dismissed the complaint with prejudice. From that order the State appealed. We granted the State's petition for certiorari prior to consideration of the case by the Court of Special Appeals.

■ Section 11–209(a) provides for an enforcement action. It reads:

(a) *Proceedings by Attorney General.* —(1) The Attorney General shall institute proceedings in equity to prevent or restrain violations of § 11–204 and may require assistance from any State's attorney for that purpose.

(2) In a proceeding under this section, the court shall determine whether a violation has been committed and enter any judgment or decree necessary to:

(i) Remove the effects of any violation it finds; and

(ii) Prevent continuation or renewal of the violation in the future.

(3) The court may exercise all equitable powers necessary for this purpose, including injunction, divestiture of property or business units, and suspension or termination of the right of a foreign corporation or association to do business in the State.

An analogous civil enforcement provision under the federal antitrust laws is found in the Sherman Act § 4, 15 U.S.C. § 4 (1982), although the degree of analogy is disputed by

---

**2.** The Federal Trade Commission order was by consent and recites that the underlying agreement was "for settlement purposes only and does not constitute an admission by [Logan] that the law has been violated ...."

the parties to this case.[3] In addition to civil enforcement proceedings brought by the Attorney General, actions for treble damages, for injunctive relief, or for both are authorized under the Md. Act by § 11–209(b). Under § 11–209(b)(2)(i) these "private" actions may be brought by "[a] person whose business or property has been injured or threatened with injury by a violation of § 11–204" of the Md. Act, and, by virtue of § 11–209(b)(1), the State, when injured in its business or property, "is a person having standing to bring an action under" § 11–209(b).[4] The com-

---

**3.** 15 U.S.C. § 4 reads:

The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises.

**4.** Section 11–209(b) in full reads:

(b) *Action for damages and injunction.*—(1) The United States, the State, and any political subdivision organized under the authority of the State is a person having standing to bring an action under this subsection.

(2)(i) A person whose business or property has been injured or threatened with injury by a violation of § 11–204 may maintain an action for damages or for an injunction or both against any person who has committed the violation.

(ii) The United States, the State, or any political subdivision organized under the authority of this State may maintain an action under subparagraph (i) of this paragraph for damages or for an injunction or both regardless of whether it dealt directly or indirectly with the person who has committed the violation. In any action under this subsection, any defendant, as a partial or complete defense against a damage claim, may, in order to avoid duplicative liability, prove that all or any part of an alleged overcharge was ultimately passed on to the United States, the State, or any political subdivision organized under the authority of this State, by a purchaser or seller in the chain of manufacture, production, or distribution who paid an alleged overcharge.

parison in federal statutes for private actions is to the Clayton Act § 4, 15 U.S.C. § 15 (1982).[5]

Under the State's theory the prayer B type of relief is available in an enforcement action brought in equity by the Attorney General. The State labels the requested award of consumers' excess payments as "restitution." Utilization of this "equitable" remedy, says the State, will "[r]emove the effects" of the retail price maintenance combination and, by its deterrent effect, also "[p]revent continuation or renewal of the violation in the future," all as authorized by § 11–209(a)(2)(i) and (ii).

Logan's position is that there can be no monetary award for the benefit of consumers in an enforcement action under § 11–209(a). It points out that a consumer who suffers a loss by way of overpayment resulting from the alleged violation of the Md. Act can recover that loss, trebled, under § 11–209(b), but that a § 11–209(b) action differs from an enforcement action under § 11–209(a). Logan emphasizes that, under the antitrust laws of the United States, courts have uniformly rejected claims brought by states attempting to use a *parens patriae* theory to collect damages on behalf of consumers. The rationale of those federal cases,

---

(3) If an injunction is issued, the complainant shall be awarded costs and reasonable attorney's fees.

(4) In an action for damages, if an injury due to a violation of § 11–204 is found, the person injured shall be awarded three times the amount of actual damages which results from the violation, with costs and reasonable attorney's fees.

(5) The Attorney General may bring an action on behalf of the State or any of its political subdivisions to recover the damages provided for by this subsection or any comparable provision of federal law.

5. 15 U.S.C. § 15 reads in pertinent part:
[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in [a] district court of the United States ... without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section ... simple interest on actual damages ....

Logan urges, should be applied to an action predicated on § 11–209(a) and result in dismissal of the complaint.

Before we analyze the arguments in detail, three general observations will bring the issue more sharply into focus. First, it is not necessary for us to decide the highly theoretical question of whether the relief claimed by the State in its prayer B is a form of restitution. *See generally* D. Dobbs, *Handbook on the Law of Remedies* 222–29 (1973). In consumer price-fixing cases the amount of the overcharge is usually the measure of actual damages. *See, e.g., In re Mid-Atlantic Toyota Antitrust Litigation*, 560 F.Supp. 760, 785 (D.Md.1983); Desiderio, *Private Treble Damage Antitrust Actions: An Outline of Fundamental Principles*, 48 Brooklyn L.Rev. 409 (1982); Annot., 16 A.L.R.Fed. 14 (1973 & Supp.1983). Here, the prayer B relief which the State says represents the unjust enrichment of Logan coincides with actual damages to consumers. It is immaterial whether that measure of damage, appropriate in a consumer's suit under § 11–209(b), can also be viewed, *vis-a-vis* the alleged price fixer, as having a restitutionary underpinning. The real question in this case is whether the State is authorized at all by § 11–209(a) to obtain a decree against an alleged price fixer for a sum measured by the excess paid by consumers.

Second, the State does not rely in this case on a class action theory. There is no allegation that the State purchased any raincoat the price of which was affected by the alleged conspiracy. The State does not claim standing on that basis to act as representative of a class of purchasers. The State's theory is that, as sovereign, it may represent persons who are entitled to receive money from Logan, without the formal joining of those persons as parties plaintiff. As discussed below courts which have faced similar contentions look to principles dealing with the concept of *"parens patriae."*

Third, we shall assume, favorably to the State, that the relief sought is a decree ordering Logan to pay the total of

all of the individual "restitutions" to the State for distribution by it to the consumers.

## I

Section 11–209(a) does not in terms say that the Attorney General may obtain in an enforcement action a monetary recovery for the benefit of third persons. The State, however, argues that a proper construction of the trial court's power to "[r]emove the effects of any violation" includes power to award the money requested in prayer B. In support the State cites *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), a case arising under § 205(a) of the Emergency Price Control Act of 1942, ch. 26, 56 Stat. 23, 33 (1942). *Porter* held that, in an action by the administrator to enjoin violations, an equity court had jurisdiction to order repayment of overcharges. Courts have similarly interpreted other statutes. *See Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) (equitable enforcement action under Fair Labor Standards Act may include order to reimburse lost wages incident to a wrongful discharge; statutory prohibition against orders for payment of unpaid minimum wages applies only to recoupment of underpayments of statutorily prescribed rates for workers while still employed); *United States v. Moore*, 340 U.S. 616, 71 S.Ct. 524, 95 L.Ed. 582, *reh'g denied*, 341 U.S. 923, 71 S.Ct. 740, 95 L.Ed. 1356 (1951) (Housing and Rent Act); *ICC v. B & T Transportation Co.*, 613 F.2d 1182 (1st Cir.1980) (Motor Carrier Act); *ICC v. J.B. Montgomery, Inc.*, 483 F.Supp. 279 (D.Colo. 1980) (same); *People v. Superior Court of Los Angeles County*, 9 Cal.3d 283, 507 P.2d 1400, 107 Cal.Rptr. 192 (1973) (state false advertising statute).

With respect to construing the Md. Act, the General Assembly declared in § 11–202(a) "that the purpose of this subtitle is to complement the body of federal law governing restraints of trade" and that "the intent of the General Assembly [is] that, in construing this subtitle, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or simi-

lar matters ...." Logan flatly states that no court has ever awarded a monetary recovery for the benefit of consumers in an equitable enforcement action under § 4 of the Sherman Act. The Attorney General has not cited, and our research has not disclosed, any decision inconsistent with Logan's general statement.

In the context of § 4 of the Sherman Act, there is a reference to restitution in *Schine Chain Theatres, Inc. v. United States,* 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245, *reh'g denied,* 334 U.S. 830–31, 68 S.Ct. 1343, 92 L.Ed. 1758 (1948), which held divestiture to be an appropriate equitable remedy under § 4 in monopoly cases. There the Court said (*id.* at 128, 68 S.Ct. at 957, 92 L.Ed. at 1258):

> To require divestiture of theatres unlawfully acquired is not to add to the penalties that Congress has provided in the antitrust laws. Like restitution it merely deprives a defendant of the gains from his wrongful conduct. It is an equitable remedy designed in the public interest to undo what could have been prevented had the defendants not outdistanced the government in their unlawful project.

On the other hand, language in *De Beers Consolidated Mines v. United States,* 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945) cuts against expanding the *Schine* comment to embrace monetary awards to non-party third persons in § 4 actions. In *De Beers* the Court vacated a preliminary injunction which had been issued pursuant to § 4 and which sequestered certain assets of corporations allegedly conspiring to monopolize importation into the United States of gems and industrial diamonds. In reversing, the Court said on the issue of the probability of ultimate success on the merits:

> Under the Sherman Act ... the District Court has no jurisdiction in this suit to enter a money judgment. Its only power is to restrain the future continuance of actions or conduct intended to monopolize or restrain commerce. [*Id.* at 219–20, 65 S.Ct. at 1134, 89 L.Ed. at 1573–74.]

The United States District Court for the Eastern District of Pennsylvania refused to include a restitution provision in its modification of consent decrees entered in enforcement cases in *United States v. General Electric Co.*, 1977–2 Trade Cas. (CCH) ¶ 61,659 (1977). The court reasoned that it had no power to order restitution when there had been no admission or adjudication of guilt and added that "[i]t would be improper to intermingle such claims with a government enforcement action which necessarily embodies different policy consideration." *Id.* at 72,717.

Maryland law has no counterpart to *Porter v. Warner Co., supra,* of which we are aware. The Attorney General has not referred us to any decision under which a Maryland administrator's statutory power to enforce by injunction, standing alone, was held impliedly to carry with it the authority to obtain "restitution" for those intended to be benefited by the regulatory scheme. The indications are that when the General Assembly intends an equity court to be able to award money for the benefit of non-party third persons in an injunction enforcement action brought by an administrator, it specifically expresses that intent. For example, in the Maryland Consumer Protection Act, §§ 13–101 to 13–501, the Attorney General is authorized by § 13–406(a) to seek an injunction to prohibit violations. Then, § 13–406(c)(2) provides that "[t]he court may enter any order of judgment necessary to ... [r]estore to a person any money or real or personal property acquired from him by means of any prohibited practice." A similar provision is found in § 14–406(c)(2) in connection with injunctions sought by the Attorney General to prohibit violations of the Maryland Consumer Products Guaranty Act, §§ 14–401 to 14–409. Consequently, we will not superimpose the rationale of *Porter v. Warner Co., supra,* on § 11–209(a) of the Md. Act unless we can find that the General Assembly intended that section to include prayer B type relief.

Turning from the federal statute analogous to § 11–209(a) to the federal counterpart of § 11–209(b), *i.e.*, § 4 of

the Clayton Act, 15 U.S.C. § 15, we find a body of caselaw involving treble damage suits brought by states which claimed in their sovereign capacities and not as victims themselves of antitrust violations. In those cases states have advanced two theories in support of their standing to sue for a monetary award: (1) the state itself has been injured in its general economy as a consequence of the alleged antitrust violation; and (2) the state as *parens patriae* may sue for damages on behalf of its citizens who have been injured by the alleged violation. Prior to a 1976 amendment to the Clayton Act, federal courts did not recognize a cause of action under § 4 predicated on either theory. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) illustrates both.

Hawaii sued under § 4 for damages and alleged a conspiracy in the sale, marketing, and distribution of refined petroleum products in that state. The sufficiency of its fourth amended complaint was the subject of the decision by the Supreme Court of the United States. An earlier version of the complaint had sought damages because the conspiracy resulted in Hawaiians " 'paying more for refined petroleum products than would have been paid in a freely operating competitive market.' " *Id.* at 254, 92 S.Ct. at 887, 31 L.Ed.2d at 188. The trial court dismissed that claim, stating:

[I]f a state is to maintain an action in its *parens patriae* capacity, *initially* the facts must show that the state has an interest "independent of and behind the titles of its citizens," *Georgia v. Tennessee Copper Co.* [206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) ], *supra;* "has an interest apart from that of the individuals affected," *Pennsylvania v. West Virginia* [262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) ], *supra;* "must show a direct interest of its own and not merely seek recovery for the benefit of individuals who are the real parties in interest," [*State of* ] *Oklahoma* [*ex rel. Johnson*] *v. Cook* [304 U.S. 387, 58 S.Ct. 954, 82 L.Ed. 1416 (1938) ], *supra;* [and] "[it] must appear that the controversy to be determined is ...

not a controversy in the vindication of grievances of particular individuals," *Louisiana v. Texas* [176 U.S. 1, 20 S.Ct. 251, 44 L.Ed. 347 (1900)], *supra.* Thus the state's *parens patriae* claim cannot be a disguised attempt to recover damages on behalf of the state's individual citizens-claimants. It is not a substitute for a class action under Rule 23, Fed.R.Civ.P. The two *theories for recovery* of damages are separate and distinct .... So, here, the State in the guise of *parens patriae* cannot recover for the individual and several possible damage claims of its many citizen-consumers of petroleum products. [*Hawaii v. Standard Oil Co.,* 1969 Trade Cas. (CCH) ¶ 72,916, at 87,517 (emphasis in original).]

In a fourth amended complaint Hawaii shifted to a theory that it had been injured in its general economy by the conspiracy. The District Court accepted that theory, 301 F.Supp. 982 (1969), but the Ninth Circuit, 431 F.2d 1282 (1970), and the United States Supreme Court, *supra*, rejected it. The Court reasoned that (1) damages for injury to a state's general economy "would open the door to duplicative recoveries" because the claimed injury was "no more than a reflection of injuries to the 'business or property' of consumers, for which they may recover themselves under § 4"; (2) no commercial interests or enterprises of Hawaii are involved and § 4 "does not authorize recovery for economic injuries to the sovereign interests of a State"; and (3) class actions under Fed.R.Civ.P. 23 are "definitely preferable in the antitrust area" to the asserted *parens patriae* action. 405 U.S. at 264–66, 92 S.Ct. at 891–93, 31 L.Ed.2d at 193–95.

Other cases which hold that § 4 of the Clayton Act, prior to the 1976 amendments, did not authorize damage suits by a state for injuries suffered by consumers are *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), *reh'g. denied,* 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 104 (1974); *California v. Frito-Lay, Inc.,* 474 F.2d 774 (9th Cir.), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2291, 36 L.Ed.2d 974 (1973); *Philadelphia Housing Au-*

*thority v. American Radiator & Standard Sanitary Corp.,* 309 F.Supp. 1057 (E.D.Pa.1969); *cf. Oklahoma ex rel. Phillips v. American Book Co.,* 144 F.2d 585 (10th Cir.1944). On the authority of the foregoing cases, it has also been held that a foreign country could not sue under § 4 for damages for injuries suffered by its consumer-nationals resulting from an alleged price-fixing conspiracy in antibiotics. *See Pfizer, Inc. v. Lord,* 522 F.2d 612 (8th Cir.1975), *cert. denied,* 424 U.S. 950, 96 S.Ct. 1421–22, 47 L.Ed.2d 356 (1976).

As part of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub.L. No. 94–435, § 301, 90 Stat. 1383, 1394 (1976), new § 15c was added to Title 15 U.S.C. Section 15c(a)(1) in relevant part provides that

> [a]ny attorney general of a State may bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State ... to secure monetary relief as provided in this section for injury sustained by such natural persons to their property by reason of any violation of sections 1 to 7 of this title. [15 U.S.C. § 15c (1982).]

The United States House of Representatives' report on the Hart-Scott-Rodino bill as "ultimately enacted into law states that the thrust of the legislation is to overturn the decision in *California v. Frito-Lay, Inc., [supra]." See Texas v. Scott & Fetzer Co.,* 709 F.2d 1024, 1025 n. 1 (5th Cir.1983); *Pennsylvania v. Mid-Atlantic Toyota Distributors, Inc.,* 704 F.2d 125, 130 n. 9 (4th Cir.1983). The General Assembly of Maryland has never made any comparable amendment to the Md. Act.

Thus, from the standpoint of the directive in § 11–202(a)(2) to be guided by federal court interpretations of federal antitrust statutes, we find not only that the Government has apparently not sought prayer B type relief in any reported § 4 enforcement action, but also that states of the United States failed in attempts to obtain prayer B relief in private actions until the federal statutes were amended to confer the power expressly.

The General Assembly has also addressed a subject legally related to the issue presented here. In § 11–209(b)(5) the Legislature empowered the Attorney General to "bring an action on behalf of ... any of [the State's] political subdivisions to recover the damages provided for by this subsection or any comparable provision of federal law." This provision authorizes either an action by the State as representative of the injured subdivision or legal representation of the injured subdivision by the Attorney General at state expense in an action in which the subdivision sues as named plaintiff. Whatever the proper interpretation might be, the legislative intent to benefit subdivisions is clear. Here, however, the State seeks a much broader representational authority, namely, to sue under the Md. Act for the benefit of private persons. If that authority were legislatively intended one would expect to find it conferred expressly, in a manner similar to that used to authorize actions for the benefit of subdivisions.

Furthermore, the Md. Act was originally enacted by Ch. 357 of the Acts of 1972. It was a Legislative Council item introduced by the Speaker as House Bill No. 1. *See* [1972] Journal of Proceedings of the House of Delegates of Maryland 62. *Hawaii v. Standard Oil Co., supra,* was decided by the United States Supreme Court on March 1, 1972. H.B. 1 initially passed the house of its origin on March 24, 1972. *See* 1972 House Journal at 1480. After having been returned from the Senate, the bill was enacted on April 8, 1972. *Id.* at 2602. Thus, the State's argument would have the General Assembly resting its intended *"parens patriae"* antitrust action on an implication in present § 11–209(a) while simultaneously directing courts to look to federal decisions in interpreting the Md. Act, despite the rejection by the Supreme Court in *Hawaii* of a *parens patriae* theory for that antitrust suit.

The State's position also requires us, without the benefit of express language, to construe § 11–209(a) as departing from the procedural requirement that actions be brought in

the name of the real party in interest. *See* former Maryland Rule 203 and present Maryland Rule 2–201, the latter of which in relevant part provides:

> Every action shall be prosecuted in the name of the real party in interest, except that [a] ... guardian ... or person authorized by statute or rule may bring an action without joining the persons for whom the action is brought. When a statute so provides, an action for the use or benefit of another shall be brought in the name of the State of Maryland.

Here the unnamed and non-joined purchasers of raincoats are the real parties in interest as to the prayer B relief.

Finally, scholarly opinion on the Md. Act is of no comfort to the State. In 1976 Professor William L. Reynolds, II, of the University of Maryland School of Law and James D. Wright of the Baltimore bar published an article entitled, *A Practitioner's Guide to the Maryland Antitrust Act*, 36 Md.L.Rev. 323. On the issue presented here those authors observed:

> If the Attorney General proceeds to trial in a civil action, a wide range of equitable relief is available. He may also request damages on behalf of the state and its political subdivisions. A damage award, however, must be based on "actual damages" to a "person" whose business or property has been injured or threatened. Thus, Maryland courts will probably follow the Supreme Court's interpretation of similar language in the Clayton Act and refuse to allow the state to sue for damages in parens patriae. [*Id.* at 344–45 (footnotes omitted).]

All of the foregoing factors indicate that the General Assembly never intended to authorize the State to obtain a monetary decree for the benefit of injured consumers. Accordingly, the trial court correctly dismissed prayer B of the complaint in this case.

## II

■ With respect to the request for injunctive relief, the State declined to exercise its opportunity further to amend.

Thereby the State elected to stand on allegations made in a complaint filed on March 2, 1981, that Logan had participated in a conspiracy "[c]ommencing at a time prior to 1972. and continuing thereafter at least until April, 1977," and that the "conspiracy will continue or be renewed unless the injunctive relief prayed for ... is granted." There is no allegation that the conspiracy was continuing at the time of the filing of suit and not even the most skeletal facts are averred to indicate that a resumption of the alleged conspiracy was threatened. The complaint does not comply with former Md.R. 370 a 2, in effect at the time of the lower court's ruling, under which "[a] bill or petition shall contain a concise statement of the facts upon which the plaintiff seeks relief, and such averments as may be necessary to entitle him to the relief sought ...." *See Att'y General v. Anne Arundel County School Bus Contractors Ass'n*, 286 Md. 324, 327, 407 A.2d 749, 752 (1979) ("[A]n injunction should not issue if the acts sought to be enjoined have been discontinued or abandoned.").

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE STATE OF MARYLAND.