State of NEW YORK, State of Maryland, and State of California, Plaintiffs,

v.

Anthony FELDMAN, John Apfelbaum, Earl P.I. Apfelbaum, Inc., Davitt Felder, Davitt Felder, Inc., Stephan Osborne, Dana Okey, Etience De Cherisey, Kees Quirijns, and Lewis Berg, Defendants.

No. 01 Civ. 6691(SAS).

United States District Court, S.D. New York.

Feb. 15, 2002.

David A. Weinstein, Jay L. Himes, Robert L. Hubbard, James Yoon, Assistant Attorneys General, Office of the New York Attorney General, New York, NY, for Plaintiff New York.

John R. Tennis, Assistant Attorney General, Office of the Maryland Attorney General, Baltimore, MD, for Plaintiff Maryland.

Lindsay Bower, Assistant Attorney General, Office of the California Attorney General, San Francisco, CA, for Plaintiff California.

James A. Mitchell, Paul L. Schechtman, Stillman & Friedman, P.C., New York,

NY, for Defendants John Apfelbaum and Earl P.L. Apfelbaum, Inc.

Gary J. Malone, Allen Dolberg, Constantine & Partners, P.C., New York, NY, for Defendants Davitt Felder and Davitt Felder, Inc.

Lawrence S. Goldman, Elizabeth Johnson, Law Offices of Lawrence S. Goldman, New York, NY, for Defendant Lewis Berg.

Stuart M. Manroel, Stuart M. Manroel, P.C., San Diego, CA, for Defendant Dana Okey.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

This action involves defendants' alleged scheme to rig the bidding process at public stamp auctions held in New York, Maryland and California (collectively, the "States"). The States, by their Attorneys General, claim that defendants' conduct deprived sellers, auction houses and others of the benefits of a competitive marketplace, thereby violating federal antitrust law as well as various state statutes. Defendants John Apfelbaum, Lewis Berg, Davitt Felder, Davitt Felder, Inc. and Earl P.L. Apfelbaum, Inc. (the "defendants") move pursuant to Rule 12(b) of the Federal Rules of Civil Procedure to dismiss certain claims brought by New York and Maryland for failure to state a claim upon which relief can be granted. For the reasons stated below, the motion is denied.

### I. MOTION TO DISMISS STANDARD

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief.' " *ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 221 (2d Cir.2001) (quoting *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999)). "At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.' " *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir.2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998) (quotation marks omitted)). The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Sims*, 230 F.3d at 20 (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984)).

In deciding a Rule 12(b)(6) motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmoving party's favor.[1] *See ICOM Holding*, 238 F.3d at 221; *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999). However, "bald assertions and conclusions of law will not suffice" to defeat even the liberal standard applied to a Rule 12(b)(6) motion. *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir.2000).

---

1. In deciding a Rule 12(b)(6) motion, the Court may examine facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference. *See Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir.2001). When documents are attached as exhibits to the complaint, the Court may review such documents if they are deemed integral to plaintiffs' claims. *See Schnall v. Marine Midland Bank*, 225 F.3d 263, 266 (2d Cir.2000); *see also Connecticut Indem. Co. v. 21st Century Transport Co., Inc.*, No. 99 Civ. 7735, 2001 WL 868340, at *3 (E.D.N.Y. July 27, 2001).

## I. BACKGROUND

Postage stamp dealing has become a profitable business in the United States.[2] *See* Amended Complaint ("Compl."), Ex. A to 12/14/01 Affirmation of James A. Mitchell, counsel for defendants John Apfelbaum and Earl P.L. Afpelbaum, Inc. ("Mitchell Aff."), ¶ 1. Many stamp dealers purchase their merchandise at auctions, which are held on a regular basis at auction houses in New York, Maryland, California and elsewhere throughout the United States, as well as abroad. *See id.* ¶ 2. At these auctions, sellers and auctioneers rely on the competitive bidding process to obtain the best prices for the stamps offered. *See id.* ¶ 4. A large majority of sellers at these auctions are individuals, many of whom are elderly or one time participants in the auction market and have neither the means nor the information to detect collusive bidding. *See id.* ¶ 3.

According to the Complaint, defendants conspired for at least seventeen years to rig bids at public stamp auctions. *See id.* ¶ 3; Plaintiff States' Memorandum in Opposition to Motion of Defendants John Appelbaum, Lewis Berg, Davitt Felder, Davitt Felder, Inc. and Earl P.L. Apfelbaum, Inc., to Dismiss the Third, Fourth and Fifth Claims for Relief in the Amended Complaint ("Pl.Opp.") at 2. Defendants, who referred to themselves as "the Ring", conducted their own secret bidding sessions prior to the actual public auctions. *Id.* ¶¶ 3–4. At the secret session, the highest bidder for a particular lot of stamps agreed to bid up to that price at the public auction and the losing bidders agreed to refrain from bidding on that particular lot. *See id.* ¶ 3. The losers were compensated for refraining based on an elaborate payoff scheme whereby the "winning" Ring member's profits were divided among the Ring. *See id.* ¶ 5. As a result of defendants' scheme, there was less competition at the public auction, sellers received lower prices, and auction houses received reduced commissions. *See id.* ¶ 3.

## III. THE COMPLAINT

The States filed a complaint against defendants on July 23, 2001 and filed the Amended Complaint on August 21, 2001. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss the Third, Fourth and Fifth Claims for Relief in the Amended Complaint ("Def.Mem.") at 2. The Complaint includes seven causes of action. In the first claim, the States allege that defendants violated section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. *See* Compl. ¶¶ 75–78. In the second claim, New York alleges that defendants violated New York's antitrust statute, the Donnelly Act, N.Y. Gen. Bus. Law §§ 340 et seq. *See* Compl. ¶ 81. These first two claims seek recovery on behalf of stamp collectors residing in plaintiffs' respective states. *See id.* ¶¶ 79, 85. In the third and fourth claims, New York alleges that defendants engaged in fraudulent and illegal conduct in violation of N.Y. Exec. Law § 63(12) and engaged in deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349. *See* Compl. ¶¶ 86–88, 90–94. Under both of these claims, New York seeks to recover for all injuries caused by defendants' fraudulent and deceptive conduct. *See id* ¶¶ 89, 95. In the fifth claim, Maryland alleges that defendants violated the Maryland Antitrust Act, Md.Code Ann., Com. Law §§ 11–201 et seq., and seeks to recover losses suffered by all persons and entities injured by defendants' conduct as well as civil penalties pursuant to Md.Code

---

**2.** For purposes of this motion, the Court accepts as true all facts alleged in the Complaint.

Ann., Com. Law § 11–209. *See* Compl. ¶¶ 96–101. In the sixth and seventh claims, California alleges that defendants violated California's antitrust statute, Cal. Bus. & Prof.Code §§ 16720 et seq., and the California Unfair Competition Act., Cal. Bus. & Prof.Code § 17200 et seq. *See* Compl. ¶¶ 102–106, 108–110. California only seeks to recover damages for its own citizens. *See* 2/5/02 Letter from David Weinstein, Assistant Attorney General of New York ("2/5/02 Ltr.").

## III. DISCUSSION

Defendants move pursuant to Rule 12(b)(6) to dismiss the third, fourth and fifth claims for relief.[3] *First,* they argue that the third and fourth claims must be dismissed because the New York statutes upon which these claims are based were not intended to address antitrust violations. *See* Def. Mem. at 15. *Second,* defendants assert that the third claim must be dismissed because New York may not use N.Y. Exec. Law § 63(12) to seek damages not available under the Donnelly Act. *See id.* at 13–14. *Third,* they argue that the third and fifth claims must be dismissed because neither New York's nor Maryland's antitrust statute authorizes the Attorney General to bring a damages action on behalf of non-residents of the state. *See id.* at 12. *Fourth,* defendants contend that, even if state law permits the Attorney General to sue for antitrust injuries incurred by non-residents, these claims are preempted by federal law. *See id.* at 5.

---

**3.** In their Memorandum of Law, defendants state that they are only seeking to dismiss the third, fourth and fifth claims. *See* Def. Mem. at 1. They state in a footnote that, if the California Attorney General seeks damages on behalf of non-residents of California, they also move to dismiss the sixth and seventh claims (presumably on preemption grounds). *See id.* at 5 n. 3. In their Reply Memorandum, defendants assert that, based on their understanding of California's position, they are also seek-

## A. May New York Rely on N.Y. Exec. Law § 63(12) and N.Y. Gen. Bus. Law § 349 to Address Antitrust Violations?

Defendants argue that neither N.Y. Exec. Law § 63(12) nor N.Y. Gen. Bus. Law § 439 were intended to address antitrust violations. *See id.* at 15. They claim that these provisions were enacted as "consumer protection legislation" focused on "the regulation of deceptive advertising and sales practices" that injure consumers. *Id.*

### 1. N.Y. Exec. Law § 63(12)

▮ Section 63(12) of the Executive Law of New York provides, in pertinent part:

> Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages . . . .

N.Y. Exec. Law § 63(12). As an initial matter, defendants' claim that section 63(12) is limited to consumer protection actions is simply incorrect. The New York

ing to dismiss the sixth claim. *See* Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Third, Fourth, Fifth and Sixth Claims for Relief in the Amended Complaint ("Def.Repl.") at 1 n. 1. Because the States have now explained that California is only seeking to recover on behalf of its own residents, *see* 2/5/02 Ltr., I will assume that defendants no longer move to dismiss the sixth claim.

Attorney General has repeatedly used section 63(12) to secure relief for persons who are not consumers in cases that are not consumer protection actions. *See, e.g., People by Vacco v. Mid Hudson Med. Group, P.C.,* 877 F.Supp. 143, 144, 146–47 (S.D.N.Y.1995) (action on behalf of hearing impaired New Yorkers harmed by discrimination in the provision of medical services); *People v. Lexington Sixty–First Assocs.,* 38 N.Y.2d 588, 381 N.Y.S.2d 836, 345 N.E.2d 307 (1976) (action on behalf of tenants and investors harmed by illegal scheme for cooperative conversion); *State v. Fashion Place Assocs.,* 224 A.D.2d 280, 638 N.Y.S.2d 26, 28 (1st Dep't 1996) (action on behalf of tenants harmed by defendant's denial of rent-stabilized leases and misrepresentations to tenants); *People by Abrams v. Hamilton,* 125 A.D.2d 1000, 511 N.Y.S.2d 190 (4th Dep't 1986) (action on behalf of female employees harmed by sex discrimination); *People ex rel. Vacco v. World Interactive Gaming Corp.,* 185 Misc.2d 852, 714 N.Y.S.2d 844, 853 (N.Y.Sup.1999) (action on behalf of investors harmed by securities law violations).

■ Defendants' argument that only the Donnelly Act should be used to address antitrust violations also lacks support. Defendants have identified no statutory language or case law that precludes plaintiffs from seeking relief for antitrust violations through section 63(12). *See Wiener v. Abrams,* 119 Misc.2d 970, 464 N.Y.S.2d 919, 921 (N.Y.Sup.1983) (declining to dismiss section 63(12) claim grounded on violations of the Rent Stabilization Law ("RSL") where there was no indication that the RSL, or the administrative body established by that law, was to be the "exclusive" means of resolving landlord-tenant disputes arising thereunder). Meanwhile, courts have held that section 63(12) should be "construed quite broadly" to apply "to all business activity accompanied by repeated acts of illegality." *Peo-*

*ple v. MacDonald,* 69 Misc.2d 456, 330 N.Y.S.2d 85, 88 (N.Y.Sup.1972). "Violations of State laws, as well as violations of Federal laws or regulations, can constitute fraud or illegality within the meaning of Section 63." *State v. Stevens,* 130 Misc.2d 790, 497 N.Y.S.2d 812, 813 (N.Y.Sup.1985). *See also State v. Citibank, N.A.,* 537 F.Supp. 1192, 1195 (S.D.N.Y.1982) (upholding section 63(12) claim alleging repeated illegal business practices grounded on violations of federal Electronic Funds Transfer Act); *World Interactive Gaming Corp.,* 714 N.Y.S.2d at 848 ("Any conduct which violates state or federal law or regulation is actionable under [section 63(12) ].").

Indeed, the New York Attorney General has often used section 63(12) to remedy antitrust violations. *See Federal Trade Commission v. Mylan Laboratories, Inc.,* 62 F.Supp.2d 25, 49–52 (D.D.C.1999) (New York Attorney General brought action under N.Y. Exec. Law § 63(12) based on allegation of antitrust violations); *American Dental Cooperative, Inc. v. Attorney General of the State of New York,* 127 A.D.2d 274, 514 N.Y.S.2d 228, 231 (1987) (holding that N.Y. Gen. Bus. Law § 343 and N.Y. Exec. Law § 63(12) gives the Attorney General "broad" authority to investigate allegations that dental product dealers "combined or conspired to eliminate discount and mail order competition in violation of the law."); *People by Lefkowitz v. Calogero,* 78 Misc.2d 953, 358 N.Y.S.2d 790, 794–95 (N.Y.Sup.1974) (enjoining "tying violations" pursuant to section 63(12)), *aff'd as modified,* 47 A.D.2d 741, 365 N.Y.S.2d 548 (1st Dep't 1975).

### 1. Section 349 of New York's General Business Law

■ Section 349 of New York General Business Law makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the

furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). Pursuant to section 349(g), the Attorney General is authorized to obtain restitution for "all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state." N.Y. Gen. Bus. Law § 349(g). As indicated by the statute's "expansive" language, section 349 was intended to be broadly applicable, extending far beyond the reach of common law fraud. *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* 178 F.Supp.2d 198 (E.D.N.Y.2001) (Weinstein, J.) (no page references available) (upholding claim under section 349 that tobacco companies engaged in scheme to distort public knowledge concerning risks of smoking); *Gaidon v. Guardian Life Ins. Co. of Am.,* 94 N.Y.2d 330, 704 N.Y.S.2d 177, 182, 725 N.E.2d 598 (1999) ("In contrast to common-law fraud, General Business Law § 349 is a creature of statute based on broad consumer-protection concerns."); *Karlin v. IVF Am.,* 93 N.Y.2d 282, 690 N.Y.S.2d 495, 498, 712 N.E.2d 662 (1999) ("The reach of th[is] statut[e] 'provide[s] needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers in our State'.") (quoting N.Y. Dept. of Law, Mem. to Governor, 1963 N.Y. Legis. Ann., at 105). The statute applies to virtually "all economic activity," *Karlin,* 690 N.Y.S.2d at 498, 712 N.E.2d 662, and may be invoked regardless of whether the allegedly deceptive activity is covered by other laws, *see Blue Cross and Blue Shield of New Jersey,* 178 F.Supp.2d 198 (no page references available); *Riordan v. Nationwide Mut. Fire Ins. Co.,* 756 F.Supp. 732, 740 (S.D.N.Y.1990).

■ To state a claim under section 349, a plaintiff must allege, among other things, that "defendants engaged in a consumer-oriented act." *Eon Labs Mfrg., Inc. v. Watson Pharmaceuticals, Inc.,* 164 F.Supp.2d 350, 364 (S.D.N.Y.2001); *see also Stutman v. Chem. Bank,* 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000). This requirement, however, has been construed liberally. A defendant engages in "consumer-oriented" activity if his actions cause any "consumer injury or harm to the public interest." *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir.1995). The "critical question", then, "is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer...." *Id.* Based on this standard, courts have found sufficient allegations of injury to the public interest where plaintiffs plead repeated acts of deception directed at a broad group of individuals. *See In re Methyl Tertiary Butyl Ether Prod. Liability Litig.,* 175 F.Supp.2d 593, 631 (S.D.N.Y.2001) (holding that defendants' alleged contamination of wells owned by plaintiffs was "sufficiently consumer-oriented to state a claim under" section 349); *The City of New York v. Coastal Oil New York, Inc.,* No. 96 Civ. 8667, 1998 WL 82927, at *7 (S.D.N.Y. Feb. 25, 1998) (holding that contract bidder's alleged "scheme" that "distorted the market for fuel oil" affected the "public at large, and plaintiffs in particular."); *Riordan,* 756 F.Supp. at 739 (holding that insureds' allegations that insurer engaged in illegal claims settlement practices "set forth precisely such allegations of injury to the public at large as are required to sustain their claim under the General Business Law."), *aff'd in relevant part,* 977 F.2d 47 (2d Cir.1992).

■ In the instant case, New York alleges that defendants engaged in a scheme to manipulate *public* stamp auctions. *See* Compl. ¶¶ 3–6. The Complaint alleges that this activity undermined New York's

interest in an "honest marketplace in which economic activity is conducted in a competitive manner," and caused injury to numerous "marketplace participants" who "rely on the competitive bidding process to obtain the best prices for the stamps offered." *Id.* ¶¶ 3, 7. Injured parties included, among others, unsophisticated individual sellers, such as the elderly and one-time participants. *See id.* ¶¶ 2, 7. These allegations are sufficient to allege misconduct affecting the public interest so as to come within the purview of section 349.

■ The collusive activity alleged in this action also falls within section 439's definition of "deceptive acts or practices". In large measure, New York courts have interpreted section 439 by looking to the definition of deceptive acts and practices under section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. *See U–Neek, Inc. v. Wal–Mart Stores, Inc.,* 147 F.Supp.2d 158, 176 (S.D.N.Y. 2001); *Genesco Enter., a Div. of Lymutt Indus. Inc. v. Koch,* 593 F.Supp. 743 (S.D.N.Y.1984); *Gaidon,* 704 N.Y.S.2d at 178, 725 N.E.2d 598; *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 532, 647 N.E.2d 741 (1995) (Kaye, C.J.). It is well-established that the government may use the FTC Act to enforce antitrust laws. *See Times–Picayune Publ'g Co. v. United States,* 345 U.S. 594, 609, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) (finding that section 5 of the FTC Act "registers violations of the Clayton and Sherman Acts"); *FTC v. Motion Picture Adver. Servs. Co., Inc.,* 344 U.S. 392, 395, 73 S.Ct. 361, 97 L.Ed. 426 (1953) (holding that conduct prohibited by Sherman Act automatically violates section 5 of the FTC

Act); *United States v. St. Regis Paper,* 285 F.2d 607, 610 n. 4 (2d Cir.1960) ("[A]ny violation of the Sherman and Clayton Acts [is] also a violation of § 5 of the Federal Trade Commission Act"); *In re Antibiotic Antitrust Actions,* 333 F.Supp. 317, 320 (S.D.N.Y.1971). The antitrust violations alleged in the Complaint constitute the kind of deceptive acts and practices contemplated by section 349.

**B. The New York Attorney General's Authority to Use Executive Law Section 63(12) to Seek Restitution for Antitrust Violations**

■ Defendants argue that section 63(12) of the Executive Law may not be used to recover restitution for alleged antitrust violations because such damages are not recoverable under the Donnelly Act.[4] *See* Def. Mem. at 13. Defendants are wrong. The damages available under the Donnelly Act are irrelevant when proceeding under section 63(12) because New York courts have consistently held that restitution sought pursuant to section 63(12) is available for misconduct covered by other laws which do not provide for restitution. *See, e.g., Concert Connection, Ltd.,* 629 N.Y.S.2d at 256 (directing restitution pursuant to section 63(12) for violation of "ticket scalping" prohibition of Arts and Cultural Affairs law article 25, even though article 25 does not itself afford this remedy); *People v. American Motor Club, Inc.,* 179 A.D.2d 277, 582 N.Y.S.2d 688, 692 (1st Dep't 1992) (directing restitution pursuant to section 63(12) for violation of Insurance Law § 2117, which does not itself provide for restitution). As explained in *American Motor Club,* it is irrelevant that

4. The Donnelly Act permits the New York Attorney General to seek injunctive relief and civil penalties "in the name and in behalf of the people," and to recover damages "on behalf of any political subdivision or public au- thority of the state." Def. Mem. at 3 (quoting N.Y. Gen. Bus. Law §§ 342, 342–a, 342–b). As defendants point out, the Act does not authorize the Attorney General to recover damages on behalf of the people.

the statute allegedly violated "does not have restitution as a remedy" where the cause of action alleges that the statutory violation "constituted repeated and consistent illegality under Executive Law § 63(12), pursuant to which restitution is a permitted remedy." 179 A.D.2d 277, 582 N.Y.S.2d at 692.

### A. The Authority of the States to Seek Relief for Non–Residents Under New York and Maryland Law

Defendants contend that the statutes relied on by New York and Maryland do not permit those States to recover antitrust injuries on behalf of non-residents. Plaintiffs contend that the respective state laws permit recovery for out-of-state victims of antitrust violations that occurred within that State's boundaries.

#### 1. New York Law

■ Defendants argue that New York may not sue on behalf of non-residents because the Donnelly Act does not permit such suits. *See* Def. Mem. at 12–14. To the contrary, courts have consistently held that section 63(12) authorizes the New York Attorney General to recover for non-residents injured by wrongdoing that occurred in New York. *See In re DeFelice,* 77 B.R. 376, 380 (Bankr.D.Conn.1987) ("New York does not and need not limit its interest in consumer protection to its citizens. New York's quasi-sovereign interest is served whenever the perpetrators of consumer fraud within its borders are brought to justice regardless of whether their victims happen to be citizens.") (holding that New York Attorney General could maintain dischargeability action on behalf of debtor's consumer creditors, regardless of their residency); *People by Vacco v. Lipsitz,* 174 Misc.2d 571, 663 N.Y.S.2d 468, 474 (N.Y.Sup.1997) ("[The] Attorney Gen-

eral has clear authority to seek to restrain illegal business practices by a local business in relation to both in-state and out-of-state residents . . . .") (holding that the court would consider complaints of out-of-state residents regarding defendant's allegedly deceptive and false practices in selling magazines through email over Internet); *State by Abrams v. Camera Warehouse, Inc.,* 130 Misc.2d 498, 496 N.Y.S.2d 659, 660 (N.Y.Sup.1985) (holding that Attorney General could seek restitution for improper credit card surcharges imposed on nonresidents).

Aware of the overwhelming authority against them, defendants insist that the cases cited above are not applicable in this case because they all "concern claims of false advertising or other fraudulent selling practices." Def. Mem. at 16. This distinction is irrelevant because none of these cases turn on the means by which the injury was inflicted. Rather, they rely on the plain language of section 63(12) which does not bar recovery for out-of-state residents. As the court in *Camera Warehouse* explained:

> [T]he plain meaning of the language of Executive Law § 63(12) indicates that the Legislature intended that all consumers be protected from illegal practices regardless of their residency and that the Attorney General of this State [is] mandated to take necessary action as provided in the statute to protect all of these consumers.

496 N.Y.S.2d at 660.

#### 2. Maryland Law

Defendants contend that the Maryland Attorney General is not authorized to seek relief for non-residents under Maryland's antitrust statute. *See* Def. Mem. at 14. Because the parties have not cited, nor has this court found, any case law directly on

point, this appears to be a case of first impression.

Section 11–204 of the Maryland Commercial Code states that no person may: "By contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce." Md. Code Ann., Com. Law § 11–204(a)(1). Pursuant to section 11–209(a)(1), the Attorney General is directed to "institute proceedings in equity to prevent or restrain violations of § 11–204 and may require assistance from any State's Attorney for that purpose." *Id.* § 11–209(a)(1). In order to "[r]emove the effects of any violation it finds" or "prevent continuation or renewal of the violation in the future," a court may:

> ... exercise all equitable powers necessary ... including but not limited to injunction, restitution to any person of any money or real or personal property acquired from that person by means of any violation, divestiture of property or business units, and suspension or termination of the right of a foreign corporation or association to do business in the State

*Id.* § 11–209(a)(2), (3).

The Maryland legislature has directed courts interpreting this statute to "be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters." *Id.* § 11–202(a)(2); *see also State v. Jonathan Logan, Inc.*, 301 Md. 63, 482 A.2d 1, 4–5 (1984); *Greenbelt Homes, Inc. v. Nyman Realty, Inc.*, 48 Md.App. 42, 426 A.2d 394, 398 (1981). According to defendants, because section 11–209 does not explicitly authorize the Attorney General to bring antitrust actions on behalf of non-residents, the statute should be interpret-

ed like federal antitrust law, which only permits a state attorney general to sue "on behalf of natural persons residing in [his or her] State." Def. Mem. at 6 (quoting 15 U.S.C. § 15c); *see also id.* at 14–15 & n. 8, 426 A.2d 394.

 The problem with defendants' argument, however, is that it ignores the differences in the plain language of section 11–209 and the comparable federal statute. Under section 4 of the Clayton Act, a state attorney general "may bring a civil [antitrust] action in the name of such State, as parens patriae *on behalf of natural persons residing in such state* ... for injury sustained by such natural persons ..." 15 U.S.C. § 15c (emphasis added). This provision, enacted in 1976, only authorizes a state attorney general to bring a federal antitrust suit on behalf of its own state's residents. In comparison, the Maryland legislature amended its antitrust statute in 1993 to specifically authorize courts to direct "restitution to *any person*" injured by an antitrust violation. Md.Code Ann., Com. Law § 11–209(a) (emphasis added). A "person" under this section is broadly defined to include any "individual, corporation, business trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity," without reference to place of residence. *Id.* § 11–201(f). While Maryland could have prohibited its Attorney General from suing on behalf of non-residents, it chose instead to give the Attorney General the power to ask a court for "restitution to any person." I decline to adopt defendants' argument which would have this Court substitute the language of a federal statute for that chosen by the Maryland legislature.[5]

---

**5.** Defendants mistakenly rely on *Jonathan Logan, supra,* and *Maryland v. Mid–Atlantic Toyota Distributors, Inc.,* 541 F.Supp. 62 (D.Md.

1981) to support their argument that the Maryland Attorney General can only sue on behalf of Maryland residents. *See* Def. Mem. at

■ Permitting the Attorney General to sue for injuries suffered by both residents and nonresidents is also in keeping with the purpose of Maryland's antitrust statute. The antitrust laws are intended "to protect the public" by "foster[ing] fair and honest intrastate competition." Md. Code Ann., Com. Law § 11–202(a)(2); *see also Grempler v. Multiple Listing Bureau,* 258 Md. 419, 266 A.2d 1, 7 (1970) ("[T]he purpose of anti-trust and unfair competition laws is to protect the public by healthy competition....."). They are intended to maintain the integrity of markets in Maryland, not "primarily to protect individual plaintiffs." *Id.; cf. Governor of Maryland v. Exxon Corp.,* 279 Md. 410, 370 A.2d 1102, 1116 (1977) (recognizing that Maryland's "power to pass legislation to promote competition by preventing monopolistic activity in restraint of trade" stems from its "legitimate interest" in "[t]he promotion of the economic welfare."), *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). If the Attorney General were not permitted to recover for injuries to non-residents resulting from illegal activity conducted in Maryland, antitrust violators would be permitted to keep large portions of their ill-gotten gains. Such a rule would severely hamper the Attorney General's ability to police and deter illegal conduct in Maryland and seriously undermine the State's interest in "protect[ing] the public" by ensuring "healthy competition." *Grempler,* 266 A.2d at 7; *see also In re Edmond,* 934 F.2d 1304, 1311 (4th Cir.1991) ("[to] permit the [retention of] even a portion of the illicit profits would impair the full impact of the deterrent force that is essential if adequate enforcement [of the law] is to be achieved, [as one] requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom") (quoting *State v. Andrews,* 73 Md.App. 80, 533 A.2d 282, 287 n. 7 (1987)) (brackets in original).

## D. Preemption

■ Defendants' final argument is that, even if the laws of New York and Maryland permit the state Attorney General to recover for antitrust injuries to non-residents, this remedy is preempted by federal antitrust law. *See* Def. Mem. at 5. The Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. Thus, "[s]tate law that conflicts with federal law is without effect." *Blue Cross and Blue Shield of New Jersey, Inc.,* 178 F.Supp.2d at 263 (citing *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 540–41, 121 S.Ct. 2404, 2414, 150 L.Ed.2d 532 (2001)). There are three bases for finding that federal law preempts state law: (1) express preemption, where Congress has expressly preempted state law; (2) field preemption, where Congress has established a comprehensive regulatory scheme intended to occupy a given field;

14–15. Both cases were decided before section 11–209 was amended in 1993. At the time of *Jonathan Logan,* section 11–209(a) only expressly permitted the Attorney General to "institute proceedings in equity" and did not expressly permit a court to award restitution for antitrust violations. *See* 482 A.2d at 2. The Maryland Court of Appeals held that, under the statute as it was then written, the Attorney General was not authorized to recover monetary relief for consumers. *See id.* at 8. *Mid–Atlantic Toyota* simply confirmed that the Maryland Attorney General was authorized to bring an antitrust action on behalf of natural persons who were residents of Maryland. 541 F.Supp. at 64. The court was not presented with the question of whether the Attorney General could sue on behalf of non-residents.

and (3) conflict preemption, where it is impossible for a party to comply with both state and federal law or the state law is an obstacle to the achievement of federal objectives. *See English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); *In re Methyl Tertiary Butyl Ether Prod. Liability Litig.*, 175 F.Supp.2d at 612. In any case, "[t]he purpose of Congress is the 'ultimate touchstone' of preemption analysis." *Blue Cross and Blue Shield of New Jersey, Inc.*, 178 F.Supp.2d at 263 (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978)). In antitrust actions like this, defendants must also overcome the presumption against finding pre-emption of state law in areas "traditionally regulated by the States." *California v. ARC Am. Corp.*, 490 U.S. 93, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

Defendants claim conflict preemption, arguing that permitting a state Attorney General to sue for antitrust injuries to non-residents "would interfere directly with the intent and operation of the federal antitrust laws...."[6] Def. Mem. at 5. They point to section 4C of the Clayton Act which only authorizes a state Attorney General to sue on behalf of his or her state's citizens.[7] *See id.* at 6, 8. According to defendants, this section was intended to preclude state Attorneys General from bringing state antitrust suits on behalf of other injured parties. They claim that Congress "established a well-defined statutory structure detailing how each of the fifty states' attorneys general could act to regulate illegal anti-competitive conduct and enforce the rights of individuals injured by that conduct." *Id.* at 8. According to defendants, "Congressional intent was clear" that "each state's attorney general *alone* has the ability to decide when a parens patriae action is appropriate on behalf of the residents of that state." Def. Repl. at 2 (emphasis in original). Thus, allowing plaintiffs to sue on behalf of non-residents would "directly undercu[t] this federal legislation." Def. Mem. at 9.

The first problem with defendants' argument is that they have offered no support whatsoever for their theory of Congressional intent. They cite no statutory language, legislative history, or case law indicating that section 4C was intended to limit the authority of state Attorneys General under state law.[8] Furthermore, defendants' argument is belied by both the legislative history of section 4C and case

---

**6.** In their submissions to the Court, defendants do not explicitly disavow any reliance on the theory of express preemption or field preemption. *See* Def. Mem. at 5. However, defendants do not point to any language in the federal law expressly preempting state laws that would permit the Attorney General to sue on behalf of nonresidents. If defendants are claiming field preemption, this argument fails because the Supreme Court has recognized that Congress has not preempted the field of anti-trust law. *See ARC Am. Corp.*, 490 U.S. at 102, 109 S.Ct. 1661.

**7.** Section 4C of the Clayton Act states:
Any attorney general of a State may bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such state ... for injury sustained by such natural person to their prop-

erty by reason of any violation of [the Sherman Antitrust Act, 15 U.S.C. §§ 1–7].
15 U.S.C. § 15c. The States do not contest defendants' assertion that this provision only authorizes a state Attorney General to bring actions on behalf of the state's citizens.

**8.** Indeed, the legislative history and case law cited in defendants' Memorandum of Law indicates that section 4C created a "new federal antitrust remedy," Def. Mem. at 6 (quoting H.R.Rep. No. 499, 94th Cong., pt. 1, at 3, 6), that *"expanded* existing common law use of parens patriae actions and *'enlarg[ed]* the potential for consumer recovery for antitrust violations'," *id.* at 7 (quoting *Pennsylvania v. Mid–Atlantic Toyota Dist., Inc.*, 704 F.2d 125, 128 (4th Cir.1983)) (emphasis added).

law examining the Attorney General's authority under section 4.

 Section 4C was enacted in 1976 as part of the Hart–Scott Rodino Antitrust Improvements Act. This provision was intended to add a "new statutory cause of action for States" under federal law to recover on behalf of "natural persons residing in [each] State" without resort to the class action procedures set forth in Rule 23 of the Federal Rules of Civil Procedure. S.Rep. No. 803, 94th Cong., 2d Sess., pt. 1 at 42; *see also State v. Reebok Int'l, Ltd.*, 96 F.3d 44, 46 (2d Cir.1996) (stating that the authority vested in state Attorneys General by the Act was intended "to circumvent the often onerous requirements of Rule 23."). When drafting the law, Congress explicitly stated that:

> Section 4C *supplements* present law, and is *not meant to preclude any action that a state or its residents may take under present or subsequently enacted law*, except as provided in section 4C(b)(3) [concerning the res judicata affect of a parens patriae judgment].

S.Rep. No. 803 at 42 (emphasis added). Thus, the legislative history of section 4C indicates that Congress intended to vest the States with *additional* powers to combat antitrust violations, not to limit the powers of the Attorneys General under state law.

The supplemental, rather than limiting, function of section 4 has been recognized by the Supreme Court. In *California v. ARC America Corp.*, the Supreme Court held that a state may authorize its Attorney General to sue for antitrust injuries to persons for whom the Attorney General could not assert claims under section 4. 490 U.S. at 105, 109 S.Ct. 1661. In that case, defendants argued that state antitrust laws permitting the Attorney General to sue on behalf of indirect purchasers were preempted by federal antitrust law, which does not allow recovery by indirect purchasers.[9] *See id.* at 100, 109 S.Ct. 1661. Rejecting defendants' argument, the Court explained that "[o]rdinarily, state causes of action are not preempted solely because they impose liability over and above that authorized by federal law." *Id.* at 105, 109 S.Ct. 1661. Having examined section 4, the Court found "no clear purpose of Congress indicat[ing] that [it] should decide otherwise." *Id.*

 Given the presumption against preemption of state antitrust laws, the legislative history of section 4C, and the general rule allowing states to authorize antitrust recovery beyond that permitted under federal law, I conclude that New York and Maryland's claims for injuries incurred by non-residents are not preempted by federal law.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the third, fourth and fifth claims for relief is denied. A conference is scheduled for March 14, 2002 at 4:30 p.m.

---

**9.** In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Court held that, with limited exceptions, section 4 of the Clayton Act did not authorize a state to recover under federal law for antitrust injuries to indirect purchasers. *See also ARC Am. Corp.*, 490 U.S. at 96, 109 S.Ct. 1661.